## THE IRON-CLAD ATLANTA.

1. On a question under the act of Congress of July 17, 1862, which distributes prize-money according to the fact whether the captured vessel is of equal or superior force to the vessel or vessels making the capture, it is proper to consider as the capturing force, not only the flag-ship, leading, actually firing and by her fire doing the only damage—immense damage—done; but also any other vessel, which by having diverted the fire of the vessel forced to surrender, by an obviously great force, by its position, conduct, and plain purpose to come at once into the engagement and to inflict perhaps complete destruction,—may have hastened the surrender.

2. Where captors appoint an agent to "represent their interest in prize-money," binding themselves, their heirs and executors to pay such agent one *per cent.* of all moneys which shall be collected and severally adjudged to them as such, requesting, by the instrument of appointment, ·· the proper officers of government to pay the said fee to the agent as a charge or fee to be deducted from the award of prize-money to be paid us, previous to paying over the same for distribution," the prize court has no power to award the percentage. The agent should apply to the proper officers of the government intrusted with the distribution of the money.

AN act of Congress* of July 17, 1862, provides that prizes taken by the navy at sea, when of *equal or superior* force to the vessel or vessels making the capture, shall be the *sole* property of the captors, and when of inferior force shall be *divided equally* between the United States and the officers and men making the " capture." When the United States thus receive prize-money it is passed to the Naval Pension Fund.

With this act in force the Atlanta, a vessel of the late rebel confederacy, was captured by our navy and condemned, with her armament and stores, as prize by the District Court for Massachusetts.

Before the vessel could be brought into port for adjudication she was taken by the Secretary of the Navy for the use of the government, and her appraised value, $351,000, deposited with the proper officers of the Treasury subject to the order of the court.

---

* 12 Stat. at Large, 750.

In distributing this fund so deposited the question arose between the United States and certain of the captors whether the captured vessel was of *superior* or of *inferior* force to the force which had captured her; the importance of the question being, of course, in this,—that if she was of superior, the captors would get the whole of her value: while, if of inferior, they would have to share it with the government.

The facts of the capture were thus:

The Atlanta—originally the British ship Fingal, and converted, by enormous labor and the cost of near a million of dollars, into a powerful iron-clad for the destruction of the government fleets, then blockading the rebel ports and coast —had been for some time previous to her capture anchored in Wassau Sound, Georgia. Two monitors of the United States, the Weehawken and the Nahant, guarded the entrance to prevent her egress. The captain of the Weehawken, Captain Rodgers, U. S. N., was the senior and commanding officer of the government force in that region, and the pilot was on board his monitor. *The presence of the monitors and their character and force were known to the rebels.* In the belief that the Atlanta was of superior force to both, she was sent down the sound to capture or destroy them; " General Beauregard," the log stated, or as Captain Rodgers testified, " the general commanding the rebel army in the military department of Charleston and Savannah"—following with a select party in a wooden gunboat behind to witness her anticipated conquest. It was early in the morning of the seventeenth of June, 1863, that her approach was descried by the monitors. These immediately prepared for action. The Weehawken, laying further up the sound than the Nahant, slipped her cable, and steamed towards the sea; the Nahant weighed her anchor and, under orders of Captain Rodgers, followed in the wake of the Weehawken. The vessels took their course towards the sea for the purpose of gaining time to get fully ready for engagement. After going out some distance, the Weehawken turned suddenly toward the enemy. At this moment the Atlanta opened her fire *on the Nahant*, which was then the nearer vessel to her, but

Statement of the case.

the shot did not take effect. The Nahant soon afterwards rounded, following the Weehawken, and the latter vessel, being now within between three and four hundred yards of the Atlanta, opened her fire, and when within two hundred yards repeated it. The first shot of the Weehawken, weighing *four hundred pounds* and fired with *thirty-five pounds of powder*,—the largest shot, it is said, ever fired in naval warfare,—struck the Atlanta upon the side of her casemate, knocking a hole in it, but without going through, and scattering over the inclosed decks great quantities of wood and and iron splinters, some of dangerous size, wounding several men, and prostrating on deck, insensible, many others. As many as forty persons were knocked down and either wounded or stunned for the moment by the effects of this shot, and it demoralized the entire crew. The next discharge carried a ball which struck the top of the pilot-house, crushing and driving down the bars on the top and sides, wounding both pilots and one helmsman, and stunning the other helmsman as well as the wounded men. These men fell in a heap on the floor of the pilot-house, and the rebel officers said prevented any one from getting up into it. In the words of Captain Rodgers, " the first shot took away the desire to fight, and the second the ability to get away." Such, in short, was the terrific effect of the Weehawken's shot, that the Atlanta *in a few minutes* surrendered. She had, in fact, struck after the first shot, though, in the smoke, her white flag was undistinguishable from a blue one used as her battle-flag. In the meantime, the Nahant was advancing with all practicable speed, making directly for the Atlanta, the captain reserving his fire until he could lay his vessel alongside the enemy, thinking that it could then be delivered with greater effect. The shortness of the period between the first fire of the Weehawken and the surrender of the Atlanta prevented the captain of the Nahant from accomplishing his purpose.

The capture of this iron-clad Atlanta was one of the early conclusive evidences that the rebel confederacy could not stand at all before the power of the government; and it was

justly regarded as a great event of the war. In its bearings upon naval science, and particularly upon naval gunnery, it has been thought to be the most significant battle of modern times except that of the Monitor and Merrimack.

The monitors were of 844 tons each; one had eighty-four men, the other eighty-five; together, 1688 tons, and one hundred and sixty-one men. They were as nearly equal to each other as could be. The Atlanta was of about 1000 tons, and had a hundred and forty-three men.

Upon this case the court below, considering that the Nahant had, in contemplation of law, taken part in the capture, and, therefore, that the capturing force was superior to the vessel captured, decreed one-half the fund to the captors, and the other half to the United States.

From this decree the officers and crew of the Weehawken appealed; a certain Hodge appealing also; the ground of his appeal being that the entire officers, crew, and hands— eighty-five persons in number—had by power of attorney appointed him their agent to represent their interest in the prize-money, binding themselves, their heirs and executors, to pay him one *per cent.* of all moneys which should be collected and severally adjudged to them as prize-money, and by the instrument of appointment requesting " the proper officers of government to pay the said fee to their said agent as a charge or fee, to be deducted from the award of prize-money to be paid to us, previous to paying over the same for distribution:" and that the court below had distributed the whole fund between the government and the captors without taking any notice at all of him, Mr. Hodge aforesaid.

*Mr. Reverdy Johnson, for the appellants ; the Attorney-General, Mr. Speed, and the Assistant Attorney-General, Mr. Ashton, not opposing,* having in fact left the court-room in company of each other soon after the case was called.

What is a capturing force? Is it the vessel which took the only active part in the capture, or does it include the other vessels, present or within signal distance, who took no part in the action, and in no way contributed to the successful

result?   There were on the Union side two monitors, the Weehawken and Nahant.   The Weehawken, when she approached the enemy, was the leading vessel, followed by the Nahant.   The Weehawken engaged the Atlanta, and compelled her to surrender before the Nahant could get into action or had fired a gun; she was, therefore, really the capturing force, unaided by the other monitor; and had the Nahant been absent, it is evident that all the circumstances and events of the fight, and the result, would have been precisely the same.   The result was due simply to the tremendous effect of a single shot; a shot, the like of which the world never heard of, and of which science had not before conceived.   The old rules of warfare were superseded by the use of novel engines of destruction.   Whoever was first struck was conquered.   Whoever fired *that* shot was victor. The Weehawken was notoriously a vessel of inferior force to her antagonist.   Will it be said that the presence of other vessels has a great moral influence on the result (even if these other vessels do not take an active part), by discouraging the one side and encouraging the other?   There might be some force in this argument, had the Atlanta suddenly fallen in with the two monitors at sea by the lifting of the fog or the breaking of the day, or had she in any other manner come unexpectedly upon them; but no such moral influence existed in this case; for the Atlanta—trusting in *her* strength, really very great, and supposed to be capable of resisting *any* shot, well knowing, too, what the opposing force was—came down proudly and with deliberation to attack the two monitors, with the conviction that she could take or destroy both.   The result was caused simply by the extraordinary and novel sort of armament, of which neither she, nor till then any one but its inventors, had formed a conception.

The officers of all these iron-clad monitors have had, may it please the court, a most severe duty to perform.   They have lived in iron dungeons, under artificial ventilation, never being able, as any one who has once seen a monitor

will readily believe, to appear on deck when afloat: the
sea was constantly beating over them.   They have been,
too, without much hope and with only a slender chance of
prize-money, as they were not cruising vessels.   This in
fact, we believe, is the only instance in which any of them
has made a dollar of prize-money.   This engagement was
most important in its effects on the war.   It did the highest
honor to the naval reputation and resources of the United
States abroad.   If considerations of liberality are in any
way to influence a decision, this is certainly a strong case for
their exercise.   We recall—needing but slightly to change
it—the language of a great judge of past time in England,
when speaking of a memorable case before him :*  "Affec-
tion, indeed, may never press on Judgment; yet it is a case
in which no man who hath any apprehension of nobleness,
but would lay hold of *a twig or a twine-thread* to support so
honorable a claim."   Nearly every prize taken during the
war has been by a superior force, as most of the prizes
have been blockade-runners.   In almost every case, there-
fore, the United States has received, for the Naval Pension
Fund, half of the amount.   That fund has thus, it is said,
obtained nine to ten millions of dollars from captures.   The
income of the sum received is five-fold of all demands upon
it.   If it gets nothing here, there is nobody to complain,
nobody to suffer.

It is obvious that the government is desirous that if the
court *can* give the whole of this money to the gallant Rodgers
and his crew, it will give it.   The attorney-general and his
young assistant—remarkable for the closeness and fidelity,
as for the ability also, with which they protect in ordinary
every interest of the government—have left this case unde-
fended, as if willing to show, what without doubt they feel,
that if the letter of the statute calls for a construction in
favor of the government—which we deny—the case itself,
and the just reward of bravery, and the spirit of the whole
country, demand another.

---

* Sir William Jones, temp. Car. I;  Case of the Earldom of De Vere, 1st
Jones; 96.

*As respects Mr. Hodge.* The appointment given him by the captors was lawful and proper; as much for their benefit and for the interests of justice as for his own. He has done his duty. The vessel has been condemned as prize. The constant changes that are occurring in the naval service will render it impossible for him to trace up the eighty-five officers and men of these vessels, scattered as they are in the time since which the capture occurred. Some are dead. The Weehawken, it is matter of well-known and sad history, has been sunk, and between twenty and thirty of her crew drowned. Except under a decree of the court, Mr. Hodge is left without resource for collecting the percentage voluntarily allowed him by the brave captors.

Mr. Justice FIELD delivered the opinion of the court.

The act of Congress of July 17, 1862, provides that if the prize taken be of equal or superior force to the capturing vessel or vessels, the whole shall go to the captors, but if it be of an inferior force the proceeds shall be divided equally between them and the United States. The court below decided that the prize was of an inferior force, and, therefore, awarded only one-half of the proceeds to the captors; and from this decision the appeal is taken.

There is no dispute about the facts of the case; they are stated with accuracy and clearness in the opinion of the learned district judge, and we can do little more than repeat his argument, and affirm his conclusion upon the point presented for our consideration.

The Atlanta had been for some time previous to her capture in Wassau Sound, and the monitors, the Weehawken and the Nahant, guarded its entrance to prevent her egress. The presence of the monitors and their character and force were known to the rebels, but in the belief that the Atlanta was of superior force to both, she was sent down the sound to capture or destroy them. It was early in the morning of the seventeenth of June, 1863, that her approach was descried. The monitors immediately began to prepare for action. The Weehawken, lying further up the sound than the

Nahant, slipped her cable, and steamed towards the sea; the Nahant weighed her anchor and followed in the wake of the Weehawken. Both vessels took this course for the purpose of gaining time to get fully ready for the engagement. The Weehawken first turned toward the enemy. At this moment the Atlanta opened her fire on the Nahant, then being the nearest vessel to her, but her shot did not take effect. The Nahant soon afterwards rounded, following the Weehawken, and the latter vessel, when within between three and four hundred yards of the Atlanta, opened her fire, and when within two hundred yards repeated it, and such was the destructive effect of her shot, that the Atlanta in a few minutes surrendered. In the meantime, the Nahant was advancing with all practicable speed, making directly for the Atlanta, the captain reserving his fire until he could lay his vessel alongside the enemy, thinking that it could then be delivered with greater effect. The shortness of the period between the first fire of the Weehawken and the surrender of the Atlanta prevented the captain of the Nahant from accomplishing his purpose.

The point presented is whether, under these circumstances, the Nahant is to be regarded as one of the capturing vessels within the meaning of the act of Congress. The importance of the point is this: the Weehawken was confessedly inferior in force to the Atlanta, and if she is alone to be regarded in the comparison of forces, the whole prize-money goes to the captors. On the other hand, the combined force of the two monitors was superior to that of the Atlanta, and if both are to be regarded as capturing vessels, only one-half of the prize-money goes to the captors, and the decree must be affirmed.

The mere fact that the only shot fired, and the only damage done, was by the Weehawken, is not decisive. Other circumstances must be taken into account in determining the matter—such as the force, position, conduct, and intention of the Nahant. The two vessels were known to be under the same command, and of nearly equal force. The

Atlanta descended the sound to attack both, and governed herself with reference to their combined action. It is not reasonable to suppose that her course would have been the one pursued, had she had only the Weehawken to encounter. Besides, the fire of the Atlanta was directed entirely to the Nahant, and of course diverted from her consort. It is possible that a different result might have followed had the fire been turned upon the Weehawken. This diversion must be considered in every just sense of the terms as giving aid to her. Again, the power of the shot of the Weehawken had evidently surprised the officers of the Atlanta, who found their vessel speedily disabled and their crew demoralized. The advance upon her, at full speed, of a second monitor, of equal force, ready to inflict similar injuries, may have hastened the surrender. It can hardly be supposed that the approach of the second monitor did not enter into the consideration of the captain and officers of the Atlanta. If the shot from the guns of one of the monitors could, in a few moments, penetrate the casemate of the Atlanta, crush in the bars of her pilot-house, and prostrate between forty and fifty of her men, her captain might well conclude that the combined fire of both would speedily sink his vessel and destroy his entire crew. It cannot be affirmed, nor is it reasonable to suppose, that any of the incidents of the battle would have occurred as they did, if the Nahant had not been present in the action.

We concur, therefore, in the view of the learned district judge, that in the comparison of the forces engaged in the conflict, the Nahant must be included with the Weehawken.

We fully appreciate the observations of counsel as to the arduous service of the officers and crews of our iron-clad monitors, but considerations of this character, or admiration of conduct of highest merit are not allowed to influence our decision, and however much we might feel disposed to do so, we are not at liberty to award to the gallant officers and men of the Weehawken and Nahant the entire proceeds of the prize. Our duty is simply to announce and apply the law; and there our power ends.

The appeal of Hodge, the agent of the officers and crews of the monitors, is dismissed. The court below had no power to award payment from the prize-money of the compensation which was agreed upon between these parties. He must apply, under his power of attorney, to the proper officers of the government charged with the distribution of the money.

The decree of the court below is

AFFIRMED.