## HERMINIO DIAZ NAVARRO AND CAYETANO COLL Y CUCHI, Complainants,

*v.*

## REGIS H. POST, Governor, SAMUEL D. GROMER, Treasurer, and GEORGE CABOT WARD, Auditor of Porto Rico.

---

San Juan, Equity, No. **655.**

BILL FOR INJUNCTION.

1. Congress on July 15th, 1909, to avoid the crisis brought about by the failure of the legislative assembly of Porto Rico, to appropriate any money to carry on the government for the current fiscal year passed an act known as the "Olmsted law," which amended § 31 of the organic act of the island (31 Stat. at L. 83, chap. 191), and used this language: "And provided further: That if at the termination of any fiscal year the appropriations necessary for the support of government for the ensuing fiscal year shall not have been made, an amount equal to the sums appropriated in the last appropriation bills for such purpose shall be deemed to be appropriated; and until

Navarro v. Post.

the legislature shall act in such behalf the treasurer may, with the
advice of the governor, make the payments necessary for the pur-
poses aforesaid." Held: That this does not mean that every specific
appropriation of the previous appropriation bills is specifically
re-enacted to be specifically devoted to the purposes specifically set
forth in such previous appropriation bills, but that it means that
an amount equal to the total of the sums appropriated in such previ-
ous appropriation bills is deemed to be appropriated for the support
of the government for the current fiscal year, with power in the
governor to allot the same to the support of the government as its
necessities may require according to existing law.

2. That no matter what the rule in cases against the officials of cities,
   towns, villages, counties, etc., may be, taxpayers as such, without any
   other interest in the matter, cannot maintain a suit to enjoin high
   state (insular) officials for an alleged diversion of public funds,
   simply because, in the opinion of such taxpayers, a particular law
   ought to be construed differently than such officials are construing it.

3. The jurisdiction of a court can only be invoked by a party having a
   personal interest in the litigation, and the mere general interest of
   a taxpayer is not sufficient to entitle him to enjoin a state or ter-
   ritorial governor, auditor, or treasurer, from performing his executive
   duties.

4. To permit a mere taxpayer to maintain such a suit would not be in
   harmony with the genius of our government, nor will its authority
   sanction, or public policy permit, the adoption of a rule which will
   authorize any number of volunteers who may rightfully, or wrong-
   fully, interpret laws differently from such high officials, to paralyze
   for a time one or more branches of the state (insular) government by
   process of injunction.

5. While it may be that high state (insular) officials can be man-
   damused to perform mere ministerial duties, it is never proper for
   courts to attempt to enjoin them from the performance of an execu-
   tive duty.

6. The duty of the governor of Porto Rico, under the act of Congress of
   July 15th, 1909, known as the "Olmsted law," is purely executive,
   and involves so much discretion as that it is not in the power of
   this court to control him regarding his action in that behalf.

Filed September 18, 1909.

*Messrs. Cayetano Coll y Cuchi, pro se,* and *Miguel Guerra y Mondragon,* for complainants.

*Hon. H. M. Hoyt,* Attorney General, and *Mr. W. N. Landers,* Assistant Attorney General of Porto Rico, for respondents.

RODEY, Judge, delivered the following opinion:

This is a bill in equity filed by complainants alleging themselves to be members of the house of delegates of the fifth legislative assembly of Porto Rico, and citizens and taxpayers of the island, against the above-named respondents as such officials of the local government. The cause was originally filed in an insular court, but was removed by respondents to this court, and held here against a motion by complainants to remand after a full hearing in that behalf. Complainants pray that the governor, treasurer, and auditor of the island be enjoined from paying out of the treasury of Porto Rico, as it is alleged they are doing, money to sustain the government of Porto Rico during the present (1909–10) fiscal year, in a pretended compliance with the act of Congress of July 15th, 1909, known as the "Olmsted bill." They contend that this act of Congress simply re-enacted and extended the appropriation bills of the island, of March 12, 1908, for another fiscal year to end June 30, 1910, and allege that, instead of complying with its terms, the executive council held a meeting, and by itself, without the concurrence of the house of delegates, fixed the salaries, not fixed in the organic act, of all officials, employees, etc., of Porto Rico, and that thereafter the governor by himself alone alloted moneys to different funds as he desired, and that such money is now being paid out without authority of law, etc.

Navarro v. Post.

The respondent officials contend that the Olmsted law simply appropriated "an amount equal to the sums appropriated in the last appropriation bills," for the purpose of supporting the government until the legislative assembly shall act in the premises, and that in the meantime. it is simply the duty of the executive council and respondents to do what they have done.

The issue before us is raised by a demurrer, interposed by the respondents to the complaint, in which it is alleged: (1) that complainants have not in law stated a cause of action; (2) that they have failed to show that they would suffer any injury or damage because of the doing of the acts complained of; (3) that they have not shown any special interest in the result of the action they complain of, different from the interest of other taxpayers; (4) that they have failed to show that the result to them would be any different if respondents should act in accordance with complainants' theory of the interpretation of the law in question; (5) that a reading of the bill, and a reading of the laws referred to, will demonstrate that respondents' actions are in all respects proper and legal; (6) that complainants have failed to show that their individual condition as taxpayers would be worse, or more burdensome, because of the acts complained of, and (7) that they have failed to show that they have any personal interest in the matter in controversy, or any such interest as would entitle them to relief in a court of equity; and that for each and all of these reasons the cause should be dismissed, etc.

The bill, of course, fully sets forth, and it is now so commonly known in Porto Rico and throughout the nation as that the court would in any event take judicial notice of it, that the fifth legislative assembly of Porto Rico, at its recent session beginning

Navarro v. Post.

January 11, 1909, adjourned on the 11th of March following, without having made any appropriations to sustain the government of the island for the ensuing fiscal year (1909–10), and again failed to do so, after being immediately called in special session on March 12th, by the governor for that purpose, and finally adjourned on March 16th, 1909, without having done so. This failure, naturally, brought on a crisis in the island's affairs, and caused the President to send a special message to Congress on the subject under date of May 10, 1909, and also induced Congress, under date of July 15th, 1909, to amend § 31 of the organic act of the island, commonly known as the "Foraker law" (31 Stat. at L. 77, chap. 191), by adding the "Olmsted bill," as a proviso thereto,—the material portion of which amendment is as follows: "And provided further: That if at the termination of any fiscal year the appropriations necessary for the support of government for the ensuing fiscal year shall not have been made an amount equal to the sums appropriated in the last appropriation bills for such purpose shall be deemed to be appropriated; and until the legislature shall act in such behalf the treasurer may, with the advice of the governor, make the payments necessary for the purposes aforesaid."

The bill then goes on to state that on the 20th of July, 1909, immediately after the approval of said amendment to the organic act by the President of the United States, the executive council of Porto Rico held a meeting, and by itself alone,— the house of delegates not then being in session,—passed the following resolution: "Whereas, § 36 of the act of Congress entitled, 'An Act Temporarily to Provide Revenues and a Civil Government for Porto Rico, and for Other Purposes,' approved April 12, 1900, provides that 'the salaries of all officials of

V. Porto Rico—5.

Porto Rico not appointed by the President, including deputies, assistants, and other help, shall be such and be so paid out of the revenues of Porto Rico, as the executive council shall from time to time determine; and

"Whereas, the salaries of all officials of Porto Rico, not appointed by the President, including deputies, assistants and other help, have not been fixed by the executive council, nor the manner of their payment out of the revenues of Porto Rico been determined for the fiscal year ending June 30, 1910, and

"Whereas, it is necessary that such salaries, and the method of their payment, be determined,

"Now therefore, be it resolved by the executive council of Porto Rico:

"1. That until otherwise provided all officials of Porto Rico not appointed by the President, including deputies, assistants, and other help, for the fiscal year ending June 30th, 1910, and their salaries, shall be such as were in effect on June 30th, 1909, and said salaries shall be paid monthly by the treasurer of Porto Rico upon the warrant of the auditor, countersigned by the governor.

"2. This resolution shall be deemed to be in force and effect from and after July 1st, 1909."

It then proceeds to complain that this action of the executive council, in thus fixing the salaries of all the officials of the island not appointed by the President, and providing for the mode of payment thereof, was in open disregard, and in plain violation, of the Olmsted law aforesaid, which law, as complainants contend, simply provided that the appropriations for such purposes, made by the second session of the fourth legislative assembly of Porto Rico, should remain in force for the succeeding fiscal

Navarro v. Post.

year to end June 30th, 1910,—and providing for the payment thereof by the treasurer with the advice of the governor alone.

The bill also alleges, that in accordance with said resolution, the auditor has drawn warrants for, and the treasurer has paid all such salaries, expenses, etc., not by authority of said Olmsted law, or in compliance therewith, but against the express terms thereof, and that said officials intend to and will continue to do so, etc. It is next further set out that respondent Regis H. Post, governor as aforesaid, after the enactment by Congress of said Olmsted law, and after such fixing of the salaries of the officials by the executive council, did as before stated, alone and by himself, without the concurrence of the legislative assembly, make a number of appropriations or allotments of money to different funds to carry on the government of Porto Rico, all of which allotments, it is alleged, are wholly illegal and without authority of law; and that respondents Gromer and Ward, treasurer and auditor as aforesaid, are allowing, permitting, and taking part in such illegal appropriations, allotments, and payments,—all contrary to law, etc.

Complainants then set forth that they have a right to oppose this illegal expenditure of their taxes, and of the moneys of the people of Porto Rico; and that, if the same is permitted to continue, complainants will be deprived of their rights, and great damage will be caused to them as well as to the rest of the tax-paying community; and that they have no adequate remedy at law, and are therefore obliged to apply to this court of equity, in which they pray for proper relief; and that respondents be enjoined, etc., and that no payments from the treasury of Porto Rico be permitted save under the appropriation bills of the fourth legislative assembly of the island, that was made for the fiscal year ending June the 30th, 1909, etc.

As we understand the contention between the parties, it is this: Complainants claim that this "Olmsted law" should be construed as if, instead of saying, "An amount equal to the sums appropriated in the last appropriation bills for such purpose shall be deemed to be appropriated," it read, "The several appropriation bills for the previous fiscal year shall each be considered as specifically re-enacted and severally continued in force."

On the other hand the respondents, as we understand it, contend that the language used simply means that an amount equal to the sum of the total appropriations for the support of the government, for the previous fiscal year, shall be deemed to be appropriated, and that then, the treasurer, with the advice of the governor, may make all payments necessary to support the government until the legislature shall act.

To be frank about it, we cannot see that there can be much difference in the result, because on examining the appropriation bills referred to (Session Laws 1908, pages 44 et seq.), we find that the very largest portion of the appropriations for that year consisted of money for salaries and expenses, and for the carrying out of the regular, indispensable functions of the government, but that still there is quite a fraction of the appropriations that might be said to be for the carrying on of the government during that fiscal year which would be unnecessary the succeeding year, such, for instance, as a thirty-thousand dollar appropriation for election purposes, when there is no election to be held this year. But if complainants' contention is right, and the revenues should prove to be insufficient the present fiscal year to do all the things for which appropriations were made last year, some of the ordinary functions of the government might have to fail of being carried out, while, as to others,

most or the whole of the particular appropriation would remain unused in the treasury, without power in any one to apply the money to those necessary governmental purposes. It is hardly to be presumed that Congress, while trying to relieve a crisis, should so phrase a statute as to accomplish only a portion of what was intended.

We have been urged to resort to the debates in both Houses of Congress, pending the passage of this "Olmsted law," with a view to determining what the intention of Congress really was; and complainants contend that these debates establish their view of the intention of Congress beyond any question. We have done so, and confess the labor was unprofitable. It is, of course, well known that while courts may resort to the history of the times, and to an examination of the conditions that necessitated the passage of a law, and may consider the mischief that was to be remedied, so as to be able to understand the object and meaning of the legislature, if the act in and of itself is ambiguous, still it is not proper for a court to resort to or to be bound by the individual views of legislators as expressed in debates during the passage of the law. Such action is universally held to be improper. See 2 Lewis's Sutherland, Stat. Constr. 2d ed. § 471. Also our opinion in the Vallecillo y Mandry v. Bertran case, 2 Porto Rico Fed. Rep. 53; United States v. Oregon & C. R. Co. 57 Fed. 426; Carter v. Hobbs, 92 Fed. 595; Fay v. Springfield, 94 Fed. 421; United States v. Union P. R. Co. 91 U. S. 79, 23 L. ed. 228; District of Columbia v. Washington Market Co. 108 U. S. 243, 27 L. ed. 714, 2 Sup. Ct. Rep. 543; United States v. Trans-Missouri Freight Asso. 166 U. S. 291, 41 L. ed. 1011, 17 Sup. Ct. Rep. 540, and Dewey v. United States, 178 U. S. 521, 44 L. ed. 1174, 20 Sup. Ct. Rep. 981.

In looking into the history of this sort of legislation we find that a somewhat similar provision appeared, so far as we can ascertain, for the first time in our national legislation, in the organic act for the territory of Hawaii in the year 1900 (31 Stat. at L. 150, chap. 339). Section 54 of that act contains a provision that is not difficult to understand. It reads as follows: "That in case of failure of the legislature to pass appropriation bills providing for payments of the necessary current expenses of carrying on the government and meeting its legal obligations as the same are provided for by the then existing laws, the governor shall, upon the adjournment of the legislature, call it in extra session for the consideration of appropriation bills, and until the legislature shall have acted the treasurer may, with the advice of the governor, make such payments, for which purpose the sums appropriated in the last appropriation bills shall be deemed to have been reappropriated."

The next place where this sort of a provision of law appears is in § 7 of the organic act of the Philippine Islands, passed in 1902 (32 Stat. at L. 694, chap. 1369). This particular section of the Philippine law was amended and re-enacted on February 27th, 1909, but it appears that no change was made in the portion of the section that we are here discussing. The provision we refer to, regarding the continuance of appropriations for the support of government, where the legislature adjourns without making the same, is word for word as the Olmsted law, supra, was when first introduced in the House at the recent session of Congress, although in the Olmsted Porto Rican law, before it was finally passed, the word "session" in the first line was stricken out, and the words "fiscal year" substituted, and the words "for the ensuing fiscal year" were inserted after the

word "government" in the second and third lines, so that the Olmsted law now reads as first above set out: "That if at the termination of any fiscal year the appropriations necessary for the support of government for the ensuing fiscal year shall not have been made," etc. ·

It will be noticed that Congress, in the Hawaiian act, said: "For which purpose the sums appropriated in the last appropriation bills shall be deemed to have been reappropriated," and two years later, when legislating for the Philippines,—although this provision of the Hawaiian act was before it,—the language used was entirely different, and instead Congress said: "An amount equal to the sums appropriated in the last appropriation bills for such purposes shall be deemed to be appropriated."

It will be noted supra, that there is another slight difference between the Philippine provision and the Olmsted law, in that in the former the word "purposes" is used in the plural twice while in the latter it is singular when first used, and plural when last used.

Now it is manifest that Congress deliberately worded the Philippine provision different from that of Hawaii, for reasons that no doubt seemed sufficient, and probably omitted putting any such provision in the Porto Rican original organic act (Foraker law), although it was passed the same year as the Hawaiian act, because no doubt it was thought there would be no need for it in the case of a people so advanced as the Porto Ricans were believed to be.

We would have no difficulty in sustaining the view complainants take of the Olmsted law, in the case at bar, if the language used was the same as that used in the Hawaiian act, but not so when we consider the language that actually is used, that "an

Navarro v. Post.

amount equal to the sums appropriated in the last appropriation bills for such purpose shall be deemed to be appropriated," which is quite different from saying "for which purpose the sums appropriated in the last appropriation bills shall be deemed to have been reappropriated."

When we attempt to ascertain the object of the passage of such a provision at all, even if we did not possess, or could not take, judicial notice of the knowledge before referred to,—of the recent action of the local house of delegates,—the very language of the Porto Rican provision would indicate that its object is to prevent the hampering or stopping of the government in any manner.

Governor Taft, of the Philippine Commission, now President of the United States, in a letter to Representative Cooper of the House of Representatives, written from Cincinnati, Ohio, on May 13th, 1902, on the eve of his departure for Rome, used this language, as the same can be seen on page 471, pt. 8, vol. 35, Cong. Record, 57th Congress, 1st Sess., Appx.: "A provision that appropriations shall not fail because of any obstruction in the popular assembly will prevent its being made an instrument for choking the government."

And in the same record on page 628, Representative Crumpacker states that Governor Taft, in an article in the Outlook, of date the 31st of May, 1902, previous, when referring to the Philippine Islands, stated that danger from obstruction of the government by withholding supplies is avoided in a section of the House bill by a provision that, should the appropriation bills not be passed, appropriations equal to those of the year before shall become available without legislation. President Taft, in his message to Congress of May 10th, 1909, transmits

Navarro v. Post.

therewith Secretary ،Ballinger's report recommending that the organic act of Porto Rico be amended to automatically provide, in such cases, an appropriation equal to the sums appropriated in the last appropriation bills for such purposes, until the legislature shall have acted.

After the examination we have given the subject we are of opinion that the clear intention of Congress in wording the Olmstead law as it did, was because it well knew that at best one year's appropriations cannot be made to exactly fit the requirements of another year, and therefore it thought best to appropriate a lump sum, equal to the total of the previous year, for the support of the government, leaving it to the discretion of the governor to reallot or subdivide this money from time to time to support the government, until the legislature shall act.

The Attorney General of the island has submitted to us, as part of his argument in this case, his letter to the governor of Porto Rico, of July 19th, 1909, in response to a request for his opinion as to the manner in which the act in question ought to be construed. After the examination we have made of the subject before us, we are constrained to conclude that the Attorney General, in the painstaking effort which he made to properly advise the governor in the letter referred to, is right in his conclusions, and we cannot better express the views he presented to the governor than by quoting his own language, which is as follows:

July 19, 1909.

The Governor of Porto Rico,
                San Juan.

Sir:—

Pursuant to general conversations heretofore had between us

and in participation with the auditor, the treasurer, and the secretary of Porto Rico, referring to the construction to be put upon the act of Congress approved July 15, 1909, hereinafter quoted in part, and having to do with the provision made by Congress for the support of the Porto Rican government when the legislature shall have failed to pass the regular appropriation bills for that purpose, and at your suggestion that I render an official opinion in answer to the various inquiries which arose during our conversation, I beg to say:

I have before me the act in question as it passed the House of Representatives June 7, 1909, printed and attested by the clerk and chief clerk of the House of Representatives. I also have a copy of the telegram to you from the Chief of the Bureau of Insular Affairs of the War Department, purporting to quote the act as approved. I note certain small differences between the text of the act as printed and the act as transmitted by wire to you, and though these differences are of slight importance, I shall assume, for the purposes of this opinion, that the printed copy is more apt to be exactly correct than the copy transmitted by telegram, particularly in view of the fact that telegraphic despatches from Washington on July 8th, and printed in our local press, have stated that the act in question passed the Senate without amendment. The part of the bill to which this opinion relates amends § 31 of the Foraker act by adding the following proviso: "And provided further: That if at the termination of any fiscal year the appropriations necessary for the support of government for the ensuing fiscal year shall not have been made an amount equal to the sums appropriated in the last appropriation bills for such purpose shall be deemed to be appropriated; and until the legislature shall act in such behalf the

Navarro v. Post.

treasurer may, with the advice of the governor, make the payments necessary for the purposes aforesaid."

I have tried to reach a correct conclusion as to exactly what was meant by the language employed. It is open to two possible constructions, one being to the effect that Congress intended to re-enact last year's appropriations, another to the effect that Congress intended to make one appropriation only, in amount equal to all of the appropriations of last year, constituting one lump sum, to be expended by the treasurer, with the advice of the governor, for the support of the government. I adopted, after painstaking consideration, the latter construction, and I am led to that conclusion by many considerations which I shall in part state.

In the first place, sums of money are not appropriated, but, in the language of the act, "an amount equal to the sums appropriated in the last appropriation bills." It is a well-known canon of statutory construction that language is to be construed in its ordinary significance, and applying that canon to the language of this act, I am constrained to believe that Congress appropriated "an amount" and not "sums." Furthermore, if it had been the intention of Congress to re-enact, for each of the activities of government, the sums appropriated last year for those purposes, the obvious, easy, and natural thing for Congress to have done, would have been to use appropriate language to that effect; for instance, "amounts equal to the sums last appropriated shall be deemed to be reappropriated," or "the appropriation bills of the preceding fiscal year shall be deemed to be re-enacted." But, on the contrary, Congress, in using the language first herein quoted, has made it clear, as it seems to me, that the "purpose" is the support of government, and that

the appropriation is of an amount sufficient to accomplish that purpose, which amount is to be subdivided into appropriate allotments corresponding to the necessities of each department and activity of the government as provided by law.  In further support of this view it may not be improper to call attention to the fact that the language of this proviso was first enacted into law by the Congress of the United States in legislating for the Philippine Islands, and in anticipation of a possibility that the legislature of the Philippines might fail to agree upon the appropriation bills necessary for the support of government, and it seems reasonable that the Congress appreciated that the necessities of government vary for different branches from year to year, and that it would be inexpedient to limit the sums to be spent in one fiscal year, for each department or branch of the public service, to the amounts which had been deemed by the legislature appropriate to the necessities of a different year. The Congress, therefore, in order to give to the provision sufficient flexibility to adapt it to the new and different necessities of the government, preferred to appropriate one total amount rather than specific sums for each of such services.  Likewise the Congress of the United States, in disposing of the situation which had actually arisen in Porto Rico, seems to have concluded that it would be best to employ the same language as had been employed in the case of the Philippines to meet a possible contingency, and for like reasons.  I therefore conclude that the intention of Congress was to make one appropriation only, applicable to the necessities of government, to be allotted in a manner best adapted to the requirements of the fiscal year, to each one of the services of the government as should prove requisite.

Passing now to the machinery which has been provided by

Navarro v. Post.

Congress, to ascertain what sums are to be thus allotted to the different departments of the government, I quote from the latter part of the proviso: "And until the legislature shall act in such behalf the treasurer may, with the advice of the governor, make the payments necessary for the purposes aforesaid." In the first place it is plain that the legislature may, at any time when it can lawfully assemble, take this whole matter out of the administrative powers of the government by passing regular appropriation bills. Until such time, however, as the legislature shall do so, I am of the opinion that it was the intention of Congress to substitute the discretion of the governor for the discretion of the legislature, in all cases where legislative enactment would otherwise have been necessary by the legislative assembly of Porto Rico. I call your attention to the fact that the word "advice" is the same word employed in the Constitution of the United States in many places; for instance, in art. 2, § 2, of the Constitution of the United States it is provided that the President shall have power, by and with the advice and consent of the Senate, to make treaties. Under such provisions of the Constitution it has been regularly held that the advice and consent of the Senate is absolutely necessary to effectuate a treaty. The same provision is found in the Constitution in regard to presidential appointments to office, and the same rule has been applied.

I conclude, therefore, that with respect to all expenditures requiring legislative enactment under the Foraker act, the governor's advice takes the place of a legislative enactment, and that it is incumbent upon the governor to authorize expenditures for all such purposes.

In order to ascertain where the governor's powers in this

regard begin and end, I have to call to your attention the language of § 36 of the Foraker act, which says: "That the salaries of all officials of Porto Rico not appointed by the President, including deputies, assistants, and other help, shall be such and be so paid out of the revenues of Porto Rico as the executive council shall from time to time determine." In the same section are fixed the salaries of the officials appointed by the President, and the section further provides that all these salaries, together with the expenses of the offices of the various officials of Porto Rico appointed by the President, shall be paid on the warrant of the auditor countersigned by the governor.

In the matter of salaries, therefore, it is plain that the executive council has been constituted with full legislative power to fix all salaries not fixed by the Foraker act itself, and it is incumbent upon that body to so fix said salaries and the manner of their payment in order to legalize salary payments for the fiscal year 1909–10. The Foraker act, however, does not clearly make provision for the ascertainment of and payment for the various expenditures outside of salaries, which matters must be deemed to have been included in the general legislative authority of the legislative assembly of Porto Rico, granted in § 32 of the Foraker act. These amounts, therefore, will require approval or advice for payment by the governor of Porto Rico. It is not stated in the Olmsted bill that the governor shall give his approval or advice at any particular time. In order, however, to have this opinion constitute an answer, so far as possible, to the various inquiries which arose during the conversations before referred to, I beg to suggest that it would seem expedient that, in a tentative form, subject to modification from time to time, the governor ought in a general way to indicate to the

various heads of departments and governmental services the amounts of money which he deems expedient to allow to be spent for such services, having in view, of course, not only the necessities of the various services themselves, but also the condition of the public treasury, and the incomes from all sources available for such purposes. In addition to such general and tentative indication by the governor, it seems to me that the governor ought, in countersigning the warrants provided by the Foraker act, and by the Political Code, to add suitable words over his signature, to the effect that he advises payment thereof, which advice would be necessary to finally legalize such payment.

The most difficult question which occurs to me, and which arose in our discussion of these matters, is this: How far is the governor under existing laws required to approve expenditures for matters which have been authorized by law? It may be that my answer to this question will not be as comprehensive as it ought to be, because it may be that these questions will, in large part, have to be settled as they arise from time to time. In a general way, however, I beg to say that the Foraker act, being the fundamental organic law of Porto Rico, must in all cases be complied with. Matters, however, which have been authorized by the laws of Porto Rico, are subject to the will of the legislative assembly, for whose will for the time being the opinion of the governor seems to have been substituted. I believe that the sanction of the legislature for certain activities of the government must be regarded as of persuasive rather than mandatory force, and that if the governor finds that available funds are insufficient to provide for the continuance of all of the lawful activities of the government for the whole fiscal

year, responsibility will rest upon the governor to choose there-from for elimination such matters as in his judgment are not absolutely necessary for the support of the government.

I do not believe that Congress intended in any way to amend provisions of the organic law or the Political Code for the pay-ments of money, and that they still require the warrant of the auditor countersigned by the governor, and I recommend that every expenditure receive not only the countersignature of the governor but his advice for payment.

I hope that this opinion will be sufficient a guide both to you and to the fiscal departments of the government to meet all pres-ent requirements, and unforeseen questions can be dealt with from time to time as they arise.

Respectfully,

(Signed) Henry M. Hoyt, 2d,

Attorney General.

We are therefore unhesitatingly of the opinion that on the merits of the case complainants have no cause of action, even on their own showing. No injury is being done, no money is being misappropriated, but the Olmsted law in our opinion is being carried out honestly according to its terms.

We are utterly unable to bring ourselves to the belief that the amendment in question can be either construed or adminis-tered, as contended for by complainants, without bringing about a situation nearly as complicated as the one which forced Con-gress to take action. But, apart from all this, we desire to say that we have only gone into the subject thus far, with a view in so far as may be, to end this useless and annoying interference with the conduct of the government of the island of Porto Rico, which Congress has established and intends shall be carried on.

Navarro v. Post.

We believe that it is the law that no private citizen or tax-payer,—and that is all that these two complainants are, because their allegation that they are members of the house of delegates adds nothing to their right to sue in this court,—has any right to sue or enjoin the state (insular) officials, or to in any manner impede or hamper them in the exercise of their official functions. See Mechem, Pub. Off. §§ 954, 987, 988. There may be cases where one or more taxpayers—and that is all these complainants are—could mandamus state (insular) officials to perform mere ministerial duties, such as the delivery of a commission of a justice of the peace to the person entitled to it, as was held in Marbury v. Madison, 1 Cranch, 137, 2 L. ed. 60, but we have not found a single case that authorizes a mere taxpayer as such to enjoin the governor of a state. One of the common provisions of all state constitutions, and of the organic acts of territories regarding the governor, is that he shall see that the laws are faithfully executed, and § 17 of the Foraker law, regarding Porto Rico, is no exception to the rule. In addition it provides that the President may, in his discretion, delegate and assign other executive duties and functions to him. So it may not be amiss to call attention to the fact, as appears from the record, that the President, through the Secretary of War, on the very day of enactment of the Olmsted law cabled the governor directing him to make the appropriations under the provisions of the law. This would indicate that the President (Secretary of War) was of opinion that the governor had to make the allotments referred to.

When it was attempted in Mississippi v. Johnson, 4 Wall. 475, 18 L. ed. 437, to enjoin the President of the United States from carrying into effect an act of Congress on the ground that

V. Porto Rico—6.

it was unconstitutional, the Supreme Court of the United States would not even permit the bill to be filed.

The arguments of Attorney General Stanbery in that case showed the fallacy of such an effort, in such a way as that the court found no difficulty in agreeing with him, and settling the proposition for all time under our system of government. See also Georgia v. Stanton, 6 Wall. 50, 18 L. ed. 721, where the same doctrine is extended to include the Secretary of State.

We have been unable to find authority for the proposition that the state (insular) officials can be enjoined from enforcing any law, even if the same is unconstitutional, but, on the contrary, find the law to be that such high officials cannot be enjoined for what is in the mere opinion of some complainant a misappropriation of public funds. The language of Judge Dunbar in the well-considered case of Jones v. Reed, 3 Wash. 65, 27 Pac. 1069, where the effort was to enjoin the state auditor, is very apt in this regard and it is as follows: "As the fallacy of a proposition can best be shown by distorting it, we may presume that, if one of the departments of the state government can be suspended at the instance of a private citizen, who has nothing more than a community interest in a matter which concerns the general public, that every department of the state can be suspended at the same time, and the whole machinery of the government stopped, and the very existence of the state, so far as the exercise of its functions are concerned, destroyed. Surely such a theory of practice is not in harmony with the genius of our government, nor will authority sanction, or public policy permit, the adoption of a rule which will authorize any number of volunteers who may, rightfully or wrongfully, interpret the laws different from the interpretation put upon

Navarro v. Post.

them by the officers of the state, to paralyze for a time every or any branch of the state government."

See also vol. 6, Am. & Eng. Enc. of Law, p. 1006, heading, "Frame of Government," and Id. vol. 14, p. 1106, heading, "Governor," and notes.

In the Jones v. Reed case it was also held that: Under the laws of that state it was the duty of the Attorney General, and not the duty of private citizens or taxpayers, to see that no misappropriation of the public moneys was made, and the court in that regard said: "The law then having provided an officer for an especial duty it is the better policy to submit such litigation to his guidance."

And is it not manifest from the letter of the Attorney General of the island to the governor, as above set out, that the former is proceeding to the best of his ability to do his duty, and to guide all concerned so that the law will be properly administered?

In our opinion these officials deserve the support and commendation of all the people of Porto Rico, for their faithful devotion to duty under trying circumstances, instead of being charged with dereliction of duty as they are under the allegations of the bill in this case.

In our opinion it was a wise, proper, and legal act for the executive council to meet as it did and pass the resolution it did fixing the salaries of the officials, because that removes all doubt about the matter of the amount of such salaries for the present fiscal year. The salaries fixed by Congress require no appropriation. See State ex rel. Rotwitt v. Hickman (State Treasurer) 9 Mont. 370, 8 L.R.A. 403, 23 Pac. 740. The allotments of money the governor is making are, in our opinion,

legal and proper, for we agree with the Attorney General that the Olmsted law, by its terms for the purpose of the present and similar occasions, has substituted his discretion for that of the legislative assembly. We think there are inherent powers in the executive, even under our system of government, that can be exercised to preserve the government itself, as there is in courts to preserve their own existence. See our opinion in Scoville v. Hadley (Auditor) 4 Porto Rico Fed. Rep. 457.

Were it not for the space it would occupy, we could with profit quote extensively from the lucid opinion of Judge Dunbar, from which we have only made short extracts, for its reasoning leaves complainants here without right to be here with their bill.

It must not be forgotten that we are speaking of the state (insular) government, and whatever the rule may be as to the right of a taxpayer, especially when he can show an interest in himself different and more burdensome than that of the rest of the community, to enjoin municipal officers of cities, towns, villages, or of corporations, the rule does not go, nor could it in justice, in our opinion, under our system of government go, to the extent of permitting mere taxpayers to enjoin state officers or the governor in the performance of their functions. The only instance in which any language of the Supreme Court of the United States could be said to lean toward complainants' contention as to the right of a taxpayer to enjoin state officers, is to be found in the case of Crampton v. Zabriskie, 101 U. S. 601, 25 L. ed. 1070, but Judge Dunbar, in the opinion we are here quoting from, considers that contention, and plainly shows that the language used by Mr. Justice Field will bear no such construction.

Navarro v. Post.

What interest have these complainants shown that they have in the matter in controversy here, other than that of any other taxpayer? The action of the officials sought to be enjoined, even if it was wrong, would not result in any heavier burden to them as taxpayers! No more money than the sum total of the last appropriation bills can or will be spent for any purpose,—hence where are complainants (or anybody else for that matter) injured? Where have complainants any personal interest in that sense in this controversy? Where have they any interest other than that of mere intermeddlers? A complainant in such a case as this must show that he is personally interested in some manner other and different than are others in the community, and that he is being deprived of his property without due process of law. See Tyler v. Registration Ct. Judges, 179 U. S. 405, 45 L. ed. 252, 21 Sup. Ct. Rep. 206; Caffrey v. Oklahoma, 177 U. S. 346, 44 L. ed. 799, 20 Sup. Ct. Rep. 664; Turpin v. Lemon, 187 U. S. 51, 47 L. ed. 70, 23 Sup. Ct. Rep. 20.

The jurisdiction of a court can only be invoked by a party having a personal interest in the litigation. Sherman v. Bellows, 23 Or. 553, 34 Pac. 549; State ex rel. Taylor v. Lord, 28 Or. 498, 31 L. R. A. 473, 43 Pac. 471; Smith v. Indiana, 191 U. S. 138, 48 L. ed. 125, 24 Sup. Ct. Rep. 51; Braxton County Ct. v. West Virginia, 208 U. S. 192, 52 L. ed. 450, 28 Sup. Ct. Rep. 275; McCandles v. Pratt, 211 U. S. 437, 53 L. ed. 271, 29 Sup. Ct. Rep. 144. And only where the complainant has a clear legal right to the relief sought, can he maintain such a suit, or will the relief be granted. National L. Ins. Co. v. National L. Ins. Co. 209 U. S. 317, 52 L. ed. 808, 28 Sup. Ct. Rep. 541.

In cases where even a question of law, as well as a question of fact, are committed by Congress to the judgment and dis-

cretion of the head of a department, his decision therein is conclusive. Bates & G. Co. v. Payne, 194 U. S. 106, 48 L. ed. 894, 24 Sup. Ct. Rep. 595.

It seems to us that the present is a case wherein we can, without impropriety, refer to the holding of the Supreme Court of the United States, regarding the action of the governor of the state of Colorado with reference to Moyer v. Peabody, 212 U. S. 79, 53 L. ed. 410, 29 Sup. Ct. Rep. 235, that "public danger warrants the substitution of the executive for the judicial process; and the ordinary rights of individuals must yield to what the executive honestly deems the necessities of a critical moment." Surely a time in Porto Rico's history when, for failure of the local assembly to act, Congress was forced to pass the Olmsted law, can be said to be critical.

It would hardly become this court, cognizant as it is of the revolutionary action of the recent local house of delegates (see our opinion in contempt cases in 4 Porto Rico Fed. Rep. 476), of which these very complainants were active members, to resolve any doubts in favor of their views in an effort to further hamper the executive departments of this island, in what appears to be the latter's honest efforts to carry on the government under the act which complainants themselves, by their own wilful delinquency, helped to make it necessary for Congress to enact.

We therefore hold that complainants have no cause of action at all; that they have no right to file this suit; that they have shown no special interest in the matter; that, in any event, they could not thus stop or hamper the government, and especially is this so as to the governor of the island. We further hold that on the merits of the case the governor and the officials are, as

matter of law, construing the Olmsted law properly, and so far as the allegations show are acting rightfully under it.

The demurrer will therefore be sustained and the case dismissed at the cost of complainants.