# DEWEY v. UNITED STATES.

### APPEAL FROM THE COURT OF CLAIMS.

No. 546.   Argued April 10, 1900.—Decided May 28, 1900.

In this case it was rightly decided in the court below, that in determining under the provisions of Rev. Stat. sec. 902, whether the Spanish vessels sunk or destroyed at Manila were of inferior or superior force to the American vessels engaged in that battle, the land batteries, mines and torpedoes, not controlled by those in charge of the Spanish vessels, but which supported those vessels, were to be excluded altogether from consideration, and that the size and armaments of the vessels sunk or destroyed, together with the number of men upon them, were alone to be regarded in determining the amount of the bounty to be awarded.

THE case is stated in the opinion of the court.

*Mr. H. A. Herbert* and *Mr. Benjamin Micou* for appellant and others.

*Mr. William B. King* for other officers and men.

*Mr. Assistant Attorney General Pradt* for the United States.

Mr. Justice Harlan delivered the opinion of the court.

This was an action in the Court of Claims to recover bounty money earned by the plaintiff in error as the commanding officer of the American fleet at the naval battle of Manila on the 1st day of May, 1898.

The statute under which the action was brought is as follows: "Rev. Stat. § 4635. A bounty shall be paid by the United States for each person on board any ship or vessel of war belonging to an enemy at the commencement of an engagement, which is sunk or otherwise destroyed in such engagement by any ship or vessel belonging to the United States, or which it may be necessary to destroy in consequence of injuries sustained in action, of one hundred dollars, if the enemy's vessel was of inferior force, and of two hundred dollars if of equal or superior force, to be divided among the officers and crew in the same manner as prize money; and when the actual number of men on board any such vessel cannot be satisfactorily ascertained, it shall be estimated according to the complement allowed to vessels of its class in the navy of the United States; and there shall be paid as bounty to the captors of any vessel of war captured from an enemy, which they may be instructed to destroy, or which is immediately destroyed for the public interest, but not in consequence of injuries received in action, fifty dollars for every person who shall be on board at the time of such capture."

The mode in which bounty money earned under that section was to be divided is indicated by the following provisions relating to the distribution of prize money:

"§ 4631. All prize money adjudged to the captors shall be distributed in the following proportions:

"First. To the commanding officer of a fleet or squadron, one twentieth part of all prize-money awarded to any vessel or vessels under his immediate command.

"Second. To the commanding officer of a division of a fleet or squadron, on duty under the orders of the commander-in-chief of such fleet or squadron, a sum equal to one fiftieth part of any prize-money awarded to a vessel of such division for a capture made while under his command, such fiftieth part to be deducted from the moiety due to the United States, if there be such moiety, otherwise from the amount awarded to the captors ; but such fiftieth part shall not be in addition to any share which may be due to the commander of the division, and which he may elect to receive, as commander of a single ship making or assisting in the capture.

"Third. To the fleet-captain, one-hundredth part of all prize-money awarded to any vessel or vessels of the fleet or squadron in which he is serving, except in a case where the capture is made by the vessel on board of which he is serving at the time of such capture ; and in such case he shall share, in proportion to his pay, with the other officers and men on board such vessel.

"Fourth. To the commander of a single vessel, one tenth part of all the prize-money awarded to the vessel under his command, if such vessel at the time of the capture was under the command of the commanding officer of a fleet or squadron, or a division, and three twentieths if his vessel was acting independently of such superior officer.

"Fifth. After the foregoing deductions, the residue shall be distributed and proportioned among all others doing duty on board, including the fleet-captain, and borne upon the books of the ship, in proportion to their respective rates of pay in the service."

It may be here stated that the provisions for prize-money and bounty to the navy were repealed by an act of Congress approved March 3, 1899, which declares that "all provisions of law authorizing the distribution among captors of the whole or any portion of the proceeds of vessels, or any property hereafter captured, condemned as prize, or providing for the payment of bounty for the sinking or destruction of vessels of the enemy hereafter occurring in time of war, are hereby repealed." 30 Stat. 1004, 1007, c. 413, § 13.

The American vessels taking part in the battle were the Olympia, Baltimore, Boston, Raleigh, Concord, Petrel, McCulloch, Nanshan and Zafiro.

The number of officers and men on those vessels during the battle was 1836.

The Spanish vessels taking part in the battle were the Reina Cristina, Castilla, Don Juan de Austria, Don Antonio de Ulloa, General Lezo, Marquez del Duero, Argos, Velasco, Isla de Mindanao, Isla de Cuba, Isla de Luzon, Manila, and two torpedo boats. The Reina Cristina, Castilla, Don Antonio de Ulloa, General Lezo, Marquez del Duero, Argos, Velasco, Isla de Mindanao and the two torpedo boats were destroyed by the American vessels. The Don Juan de Austria, Isla de Cuba and Isla de Luzon were disabled and put out of action in the battle, and were captured; but they were subsequently floated and repaired by the United States and now constitute a part of the American navy. The Manila was captured in the same engagement.

No claim for bounty under section 4635 is made in the present action on account of the sinking of the Don Juan de Austria, Isla de Cuba and the Isla de Luzon, because proceedings are to be begun in the Supreme Court of the District of Columbia to condemn those vessels as prize of war, the claimant reserving the right to make such claim hereafter, if it should be held that the vessels are not subject to condemnation in prize.

The total number of men on board the Spanish vessels during the battle of Manila was 2973. The total number on board the Spanish vessels destroyed was, at the commencement of the action, 1914.

The enemy's vessels were supported by land batteries and by mines and torpedoes in the entrance to Manila Bay and in the bay itself, and some of those in the bay exploded during the action.

It was found as a fact by the Court of Claims — and this court must assume it to be true — that taking into consideration the guns at Corregidor, El Fraile and other forts at the entrance of the bay and those at Manila and Cavite, and the torpedoes and mines in the bay and the entrance to it, the enemy's force was superior to the force of the vessels of the United

States; but that excluding shore batteries and submarine de-fences, the American vessels and armaments were superior in force to the Spanish vessels.

The court below — all its members concurring — was of opin-ion that the land batteries, mines and torpedoes that supported the Spanish vessels during the naval engagement in Manila Bay should be excluded from consideration, and that the claim of the plaintiff came within the clause of the statute allowing the sum of one hundred dollars for each person on board of the vessels sunk or destroyed "if the enemy's vessel was of inferior force," and not within the clause allowing the sum of two hun-dred dollars, "if [the enemy's vessel was] of equal or superior force." Judgment was accordingly entered against the United States for the sum of $9570, upon the basis of one hundred dol-lars for each person on board, at the commencement of the en-gagement, of the enemy's vessels sunk or destroyed.

The counsel have called our attention to several cases in this and other courts. Do any of those cases constitute a direct ad-judication of the question now before us?

In *The Ironclad Atlanta*, 3 Wall. 425, 432, the question was whether a certain American vessel, the Nahant, was to be re-garded as one of the capturing vessels in a naval engagement in Wassau Sound, Georgia, in 1863. The court said: "The importance of the point is this: the Weehawken was confess-edly inferior in force to the Atlanta, and if she is alone to be regarded in the comparison of forces, the whole prize-money goes to the captors. On the other hand, the combined force of the two monitors was superior to that of the Atlanta, and if both are to be regarded as capturing vessels, only one half of the prize-money goes to the captors, and the decree must be affirmed. The mere fact that the only shot fired and the only damage done was by the Weehawken is not decisive. Other circumstances must be taken into account in determining the matter — such as the force, position, conduct and intention of the Nahant. The two vessels were known to be under the same command, and of nearly equal force. The Atlanta descended the sound to attack both, and governed herself with reference to their combined action. It is not reasonable to suppose that

her course would have been the one pursued, had she had only the Weehawken to encounter. Besides, the fire of the Atlanta was directed entirely to the Nahant, and of course diverted from her consort. It is possible that a different result might have followed had the fire been turned upon the Weehawken. This diversion must be considered in every just sense of the terms as giving aid to her. Again, the power of the shot of the Weehawken had evidently surprised the officers of the Atlanta, who found their vessel speedily disabled and their crew demoralized. The advance upon her, at full speed, of a second monitor, of equal force, ready to inflict similar injuries, may have hastened the surrender. It can hardly be supposed that the approach of the second monitor did not enter into the consideration of the captain and officers of the Atlanta. If the shot from the guns of one of the monitors could, in a few moments, penetrate the casemate of the Atlanta, crush in the bar of her pilot-house, and prostrate between forty and fifty of her men, her captain might well conclude that the combined fire of both would speedily sink his vessel and destroy his entire crew. It cannot be affirmed, nor is it reasonable to suppose, that any of the incidents of the battle would have occurred as they did if the Nahant had not been present in the action."

Another case referred to is that of *The Siren*, 13 Wall. 389, 395. That was a case in prize arising out of certain captures near Charleston, South Carolina, in 1865, of rebel vessels during the late civil war, as the result of the joint action of the land and naval forces of the United States. This court, affirming the judgment of the District Court for the District of Massachusetts, held that Congress had made no provision in reference to joint captures by the army and navy, and that such captures enured exclusively to the benefit of the United States. The court said: "We have already adverted to the ingress of the navy into the harbor of Charleston on the morning of the 17th day of February. At nine o'clock that morning an officer of the land forces hoisted the national flag over the ruins of Fort Sumpter. Flags were also raised over Forts Ripley and Pinckney. At ten o'clock a military officer reached Charleston. The mayor surrendered the city to him. Four hundred and

fifty pieces of artillery, military stores, and much other property were captured with it. Contemporaneously with these things was the seizure of the Siren by the Gladiolus, and the approach and arrival of the rest of the fleet. The two forces were acting under the orders of a common government, for a common object, and for none other. They were united in their labors and their perils, and in their triumph they were not divided. They were converging streams toiling against the same dike. When it gave way both swept in without further obstruction. The consummation of their work was the fall of the city. Either force, after the abandonment of their defences by the rebels, could have seized all that was taken by both. The meritorious service of the Gladiolus was as a salvor, and not as a captor. Precedence in the time of the arrival of the respective forces is an element of no consequence. Upon principle, reason and authority, we think the judgment of the District Court was correctly given."

The case chiefly relied upon by the plaintiff is *United States* v. *Farragut*, 22 Wall. 406. The question now presented might perhaps have been determined under the pleadings in that case, if it had not been withdrawn from consideration before this court rendered its judgment. Admiral Farragut and others of the American navy filed a libel in admiralty in the Supreme Court of the District of Columbia on account of certain prizes taken below New Orleans in April, 1862. The plaintiff and the Government referred the cause to the determination and award of certain persons, whose award was to be final upon all questions of law and facts involved — the award to be entered as a rule and decree of court in the case, with the right also of either party to appeal to this court as from other decrees or judgments in prize cases. The arbitrators made an award, holding among other things that certain captures were not a conjoint operation of the army and navy of the United States. Exceptions were filed to the award, as erroneous in point both of law and fact. The exceptions were overruled and a decree was entered for the claimants. After the case came to this court the Attorney General, according to the report of the case, dismissed the appeal as to certain property covering $613,520 of the aggregate

sum allowed by the decree, and that sum was distributed among the captors. That part of the case, it is stated, raised the very question now presented, and it is contended that the action of the Attorney General should be regarded as indicating the interpretation placed upon the statute by the Executive Department. We cannot accept this view. It does not appear from the report of the case what reasons induced the Attorney General to dismiss the appeal of the Government as to the matters referred to. It may have been because of the conviction that, under the facts disclosed by the record, the capture in question was not the result of the conjoint action of the army and navy, but of the action alone of the navy. It is sufficient to say that this court regarded the statement by the arbitrators that the capture was not the joint act of the army and navy as binding upon it, and what appears in the opinion about other points has no bearing upon the present case.

Another case referred to by counsel is *Porter* v. *United States*, 106 U. S. 607, 611. But the decision there did not go beyond the point that the act of June 30, 1864, 13 Stat. 306, 311, c. 174, did not allow bounty where the vessels of the enemy, during the late rebellion, were destroyed by the combined action of the land and naval forces of the United States. The court said: " Prize-money, or bounty in lieu of it, is not allowed by the laws of Congress where vessels of the enemy are captured or destroyed by the navy with the coöperation of the army. To win either, the navy must achieve its success without the direct aid of the army, by maritime force only. No pecuniary reward is conferred for anything taken or destroyed by the navy when it acts in conjunction with the army in the capture of a fortified position of the enemy, though the meritorious services and gallant conduct of its officers and men may justly entitle them to honorable mention in the history of the country."

Nor has *The Selma*, 1 Lowell, 30, 34, any bearing upon the present discussion. That case arose out of certain captures made in the action of August 5, 1864, in the bay of Mobile. It was there decided—and nothing else was decided—that in order to entitle a vessel to participate in the distribution of a

prize, its situation during the naval engagement must have been such that it could have rendered assistance in the actual conflict in which the prize was taken. The court said: "Suppose it had happened in the case now before me, as once occurred on the Mississippi under the same great captain, that only a small number of vessels had made good the passage of the forts; and that they had found themselves only equal or inferior in force to the enemy within, and had then succeeded by their skill and gallantry in making this capture. It would be impossible, I think, under the case of *The Atlanta*, or on principle, to hold that the vessels outside were actual takers, and to reduce the credit and reward of the conquerors to the level of a capture by superior force. And it will not be easy under our law to define actual captors in such a way as not to require of them at least the qualifications of position and power to do service which the statute peremptorily imposes on constructive takers."

We have referred quite fully to these cases because they were made the subject of comment by counsel. But we do not think that any of them meet the precise question now presented. They throw no light on the inquiry whether, in estimating the force of the enemy's vessel, the support furnished by land batteries, mines and torpedoes is to be taken into consideration.

The words in the existing statute relating to the distribution of prize-money are not entirely new. In the act of March 2, 1799, 1 Stat. 709, 715, c. 24, § 5, relating to the navy of the United States, it was provided: "That all captured national ships or vessels of war shall be the property of the United States—all other ships or vessels, being of superior force to the vessel making the capture, in men or in guns, shall be the sole property of the captors—and all ships or vessels of inferior force shall be divided equally between the United States and the officers and men of the vessel making the capture."

In an act of April 23, 1800, 2 Stat. 45, 53, c. 33, § 7, for the better government of the navy, it was provided: "That a bounty shall be paid by the United States of twenty dollars for each person on board any ship of an enemy at the commencement of an engagement, which shall be sunk or destroyed by

any ship or vessel belonging to the United States of equal or inferior force, the same to be divided among the officers and crew in the same manner as prize-money."

The fourth section of the act for the better government of the navy, approved July 17, 1862, 12 Stat. 600, 606, c. 204, § 4, contained this provision: "That a bounty shall be paid by the United States for each person on board any ship or vessel of war belonging to an enemy at the commencement of an engagement which shall be sunk or otherwise destroyed in such engagement, by any ship or vessel belonging to the United States, or which it may be necessary to destroy in consequence of injuries sustained in action, of one hundred dollars, if the enemy's vessel was of inferior force; and of two hundred dollars, if of equal or superior force; to be divided among the officers and crew in the same manner as prize-money; and when the actual number of men on board any such vessel cannot be satisfactorily ascertained, it shall be estimated according to the complement allowed to vessels of their class in the navy of the United States; and there shall be paid as bounty to the captors of any vessel of war captured from an enemy, which they may be instructed to destroy, or which shall be immediately destroyed for the public interest, but not in consequence of injuries received in action, fifty dollars for every person who shall be on board at the time of such capture."

Then came the act of June 30, 1864, 13 Stat. 306, 310, c. 174, § 11, regulating prize proceedings and the distribution of prize-money. The eleventh section of that act is substantially the same as the fourth section of the act of 1862, and is reproduced in § 4635 of the Revised Statutes on which the claimant bases his action against the United States.

It thus appears that Congress, in providing for bounty to be paid by the United States on account of enemy vessels sunk or otherwise destroyed by any ship or vessel belonging to the United States, has never prescribed any other rule than to give the smaller amount when the enemy's *vessel* was of inferior force, and the larger amount when the enemy's *vessel* was of equal or superior force. We are asked to construe the words in the present statute " one hundred dollars, if the enemy's

*vessel* is of inferior force, and two hundred dollars if of equal or superior force," to mean just what it would mean if the question of the inferiority or superiority of the enemy's vessel was made, by express words, to depend upon the inquiry whether it was or was not supported in the naval engagement by land batteries, mines and torpedoes under the charge of others than those having the management of the enemy's vessel. We cannot do that without going far beyond the obvious import of the words employed by Congress. Of course, our duty is to give effect to the will of Congress touching this matter. But we must ascertain that will from the words Congress has chosen to employ, interpreting such words according to their ordinary meaning as well as in the light of all the circumstances that may fairly be regarded as having been within the knowledge of the legislative branch of the Government at the time it acted on the subject. There is undoubtedly force in the suggestion that in rewarding officers and sailors who have sunk or destroyed the enemy's vessels in a naval engagement it is not unreasonable that all the difficulties, of every kind, with which they were actually confronted when engaging the enemy should be taken into consideration. But that was a matter which we cannot suppose was overlooked by Congress; and we are not at liberty to hold that it proceeded upon the broad basis suggested, when it expressly declared that the amount of its bounty shall depend upon the question whether " the enemy's *vessel*" —not the enemy's vessel *and* the land batteries, mines and torpedoes, by which it was supported—was of inferior or of equal or superior force.

In our examination of this case we have not forgotten the skill and heroism displayed by the distinguished commander of our fleet in the battle of Manila, as well as by the officers and sailors acting under his orders. All genuine Americans recall with delight and pride the marvelous achievements of our navy in that memorable engagement. But this court cannot permit considerations of that character to control its determination of a judicial question or induce it to depart from the established rules for the interpretation of statutes. Nor can we allow our judgment to be influenced by the circumstance that Congress

has recently repealed all statutes giving bounty to officers and soldiers of the navy for the sinking or destruction hereafter, in time of war, of an enemy's vessels—thereby, it may be assumed, indicating that in the judgment of the legislative branch of the Government the policy of giving bounties to the navy was not founded in wisdom and should be abandoned. This court has nothing to do with questions of mere policy that may be supposed to underlie the action of Congress. What is termed the policy of the Government in reference to any particular subject of legislation, this court has said, " is generally a very uncertain thing, upon which all sorts of opinions, each variant from the other, may be formed by different persons. It is a ground much too unstable upon which to rest the judgment of the court in the interpretation of statutes." *Hadden* v. *The Collector*, 5 Wall. 107, 111. Our province is to declare what the law is, and not, under the guise of interpretation or under the influence of what may be surmised to be the policy of the Government, so to depart from sound rules of construction as in effect to adjudge that to be law which Congress has not enacted as such. Here, the language used by Congress is unambiguous. It is so clear that the mind at once recognizes the intent of Congress. Interpreted according to the natural import of the words used, the statute involves no absurdity or contradiction, and there is consequently no room for construction. Our duty is to give effect to the will of Congress, as thus plainly expressed. *United States* v. *Fisher*, 2 Cranch, 358, 399; *Lake County* v. *Rollins*, 130 U. S. 662, 670.

In our opinion, the Court of Claims did not err in holding that in determining whether the Spanish vessels sunk or destroyed at Manila were of inferior or superior force to the American vessels engaged in that battle, the land batteries, mines and torpedoes not controlled by those in charge of the Spanish vessels but which supported those vessels, were to be excluded altogether from consideration, and that the size and armaments of the vessels sunk or destroyed, together with the number of men upon them, were alone to be regarded in determining the amount of the bounty to be awarded. In that view the decree below was right, and it is

*Affirmed.*

MR. CHIEF JUSTICE FULLER, with whom concurred MR. JUS-
TICE WHITE and MR. JUSTICE McKENNA, dissenting.

Claimant in prosecuting this case, in effect, represents the
claims of all the officers and men engaged in the battle of Ma-
nila Bay, May 1, 1898. The question is not whether there was a
grant of bounty, for that is not disputed. It is simply as to the
amount of bounty, and the correct result turns upon the
construction of the statute. There being no controversy in re-
spect of the existence of the grant, I am of opinion that the
rule of strict construction does not apply, and that the statute,
in view of its object, should be construed liberally in favor of
the beneficiaries. If so construed, the judgment ought to be
reversed.

The applicable statutory provision is as follows:

" A bounty shall be paid by the United States for each per-
son on board any ship or vessel of war belonging to an enemy
at the commencement of an engagement, which is sunk or
otherwise destroyed in such engagement by any ship or vessel
belonging to the United States, or which it may be necessary
to destroy in consequence of injuries sustained in action, of one
hundred dollars, if the enemy's vessel was of inferior force, and
of two hundred dollars, if of equal or superior force, to be di-
vided among the officers and crew in the same manner as prize
money; . . ."

The obvious object of the law was to encourage personal
gallantry and enterprise. If the hostile force was equal or su-
perior then the bounty was to be double what it would be if the
enemy's force was inferior, because the hazards to be run were
so much the greater. But the bounty was limited in total
amount by the number of persons on board the vessels of the
enemy, which appears to have been considered to be a practica-
ble restriction.

The chief distinction, as a military achievement, of the vic-
tory of Manila Bay, is that the American fleet, unaided by an
army, attacked a force composed of ships supported by power-
ful shore defences, together with submarine mines and torpe-
does; and, in defiance of these open and hidden dangers, in ad-

dition to the power of the enemy's fleet, sailed in, and not only destroyed or captured all the opposing vessels, but captured or silenced the shore batteries. To omit consideration of these circumstances in determining pecuniary reward under the statute seems to me to be altogether unreasonable, and yet it is held that in comparing the opposing forces, the shore batteries and submarine mines and torpedoes, which our fleet was compelled to encounter, should not be taken into account, though the bounty could not rise above the number of persons on the enemy's ships.

It is my judgment that the intent plainly was that the entire opposing forces should be compared, and that the shore batteries, mines and torpedoes, protecting and defending the vessels of the enemy, should be included in estimating the rate of bounty, although they were, of course, not armaments or means of attack or defence, directly located on the enemy vessels themselves. Indeed, the words of the statute, if literally construed, might be limited to engagements of single vessels on each side, yet as to this the principal opinion correctly applies a liberal construction, and any other would be preposterous. But if a liberal construction be proper at all, why not altogether?

The action of the Government in respect of the taking of vessels by Admiral Farragut in the capture of New Orleans, has great significance. That case involved an award made by a distinguished board of arbitrators, Henry W. Paine, of Massachusetts; Thomas J. Durant, of the District of Columbia, and Gustavus V. Fox, then late Assistant Secretary of the Navy, one of whose findings was: "That in the engagement which resulted in the capture of those ships, the entire force of the enemy was superior to the force of the United States ships and vessels so engaged." This finding was conceded to have included the forts and batteries on shore, but that was not definitely stated. The executive department acquiesced in the award of the arbitrators on this branch of the case without demanding a more specific finding, and this court was not called upon to determine the precise question. 22 Wall. 406.

*The Siren,* 13 Wall. 389, is not to the contrary, inasmuch as that was a case of joint capture by the army and navy, and

Congress had made no grant in such circumstances. Here the victory was that of the navy alone, and the pecuniary fruits under this statute should not be diminished because the opposing force was partly on shore or under water.

Undoubtedly it is our duty to give effect to the will of Congress, but in ascertaining its will the object Congress manifestly sought to attain must be recognized, and should be controlling, unless positively defeated by the language used.

I am unable to concur in the opinion and judgment of the court, and am authorized to say that Mr. Justice White and Mr. Justice McKenna concur in this dissent.