CARRIE S. FAIR, AS EXECUTRIX OF THE LAST WILL AND TESTAMENT OF WILLIAM B. FAIR, PETITIONER, *v*. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 77954.   Promulgated November 10, 1936.

*Franklin F. Russell, Esq.*, for the petitioner.
*Lewis S. Pendleton, Esq.*, for the respondent.

### OPINION.

LEECH: This proceeding was brought to redetermine a deficiency of $12,738.09 in the estate tax of the estate of William B. Fair.

The petitioner alleges that the respondent erred in including in the gross estate of the decedent the value of certain interests in land located in the Republic of Cuba, known as "hipotecas" (freely translated "mortgages") and constituting "immovables" under the laws of Cuba.

The facts, in part stipulated and in part adduced by deposition, in so far as material, are substantially as follows:

The decedent, William B. Fair, died on July 12, 1932, a citizen of, domiciled in, and a resident of the State of New Jersey. The petitioner, who resides in East Orange, New Jersey, is the duly appointed, qualified, and acting executrix under the decedent's will, having been granted letters testamentary by the Prerogative Court of New Jersey, on October 13, 1932.

The decedent's will was executed in Havana, Cuba, May 23, 1932. It contains the following translated recitations:

NUMBER ONE HUNDRED AND SEVENTEEN

REGULAR PUBLIC WILL

IN THE CITY OF HAVANA, on the twenty third of May, nineteen hundred and thirty two, BEFORE ME:—Doctor ALTERTO JARDINES AND NAVARRETE. Attorney at Law and Notary Public of the Colleges and District of this Capital and a resident thereof.

APPEARS

Mister WILLIAM BARNABUS FAIR. * * * american citizen, sixty six years of age, married once, a merchant and resident of this city in the house numbered thirty nine on Amargura Street, today Marta Abreu.

He states * * *

That he desires to make his will in accordance with the laws of the State of New Jersey, United States of North America, of which he is a citizen, and in accordance with said laws he can freely dispose of all his estate and he orders it in the following manner:

\*        \*        \*        \*        \*        \*        \*

The will established certain specific bequests to his daughter, grandsons, brothers, and sister and bequeathed the remainder of his estate to his wife, Carrie Stockin Fair, whom he named as executrix.

In addition to his wife, the petitioner herein, the decedent was survived by a daughter, two brothers, a sister, and two grandsons, all of whom are citizens and residents of the United States, and together constitute the decedent's heirs, next of kin, devisees, and legatees.

At the time of his death the decedent was the owner of three certain mortgages on land located in the Republic of Cuba. The translation of the pertinent portions of one of the mortgages, identical in terms with the other two in all material respects, is as follows:

### NUMBER FIFTY-NINE

#### SEGREGATION, SALE AND MORTGAGE

IN THE CITY OF HAVANA, on April 1st, 1922.—BEFORE ME: Doctor JOSE ANTONIO DOWLING Y PURI, Lawyer and Notary Public of this City with permanent residence therein.—

#### APPEAR:

PARTY OF THE FIRST PART: Mr. WILLIAM BARNABUS FAIR, \* \* \* who states he was born in the United States of America, of legal age, married, property owner and a resident of this city at 39 Amargura Street.

AND PARTY OF THE SECOND PART: Mr. ROBERT HENRY LEEDER, \* \* \* who states he was born in Canada, American citizen, of legal age, married, agriculturist and a resident of Itabo, town in the Province of Matanzas, Republic of Cuba, incidentally in this city.—

\*        \*        \*        \*        \*        \*        \*

Mr. William Barnabus Fair states:

FIRST: That he is the owner in full and complete ownership of the immovable property described as follows: \* \* \* [Here follows a description of a farm containing 358 cabs of land and 162 cordeles.]

SECOND: That he has agreed to segregate from the above described farm a portion of land with the object of its registration in the Registry of the Property as a separate farm, which is described as follows: \* \* \* [Here follows a description of a farm containing 264 cabs and 250 cordeles.]

SIXTH: That having so agreed with the other appearer, Mr. Robert Henry Leeder, who does not use any other name, he executes that he sells really and perpetually the immovable described in clause second of this instrument, with all that constitutes and is annexed to same, free from all liens and with the area existing within the described boundaries \* \* \*

SEVENTH: The price of this sale is the sum of $37,500 in gold coin of the United States of America, which the buyer, Mr. Robert Henry Leeder, pays to the seller as follows: $1,000 official currency which Mr. William Barnabus Fair confesses to have received before this act to his entire satisfaction from

the hands of the buyer, for which amount he executes formal receipt and acquittance; the balance of $36,500 in gold coin of the United States of America which completes the price will be paid by the buyer in the manner hereinafter explained.—

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

NINTH: Mr. Robert Henry Leeder accepts in his favor the sale of the * * * immovables * * * sold to him by this document, accepting the possession and delivery of the latter, and adds that he acknowledges and constitutes himself a certain, and legitimate debtor of the other party appearing, Mr. William Barnabus Fair, for the net amount of $36,500 in gold coin of the United States of America as balance of the price of the sale of the immovable acquired by this instrument, which sum he agrees to return to Mr. William Barnabus Fair, or whoever his rights may represent by any reason, precisely in this city, in the term of six years which shall be counted from the first day of the coming August and shall become due on the same day and month of the year 1928, subject to the following clauses and conditions:

A: The $36,500 owed shall bear interest from the first day of August of the present year, at the rate of 3% per annum during the first two years, and 6% per annum during the four following years. Said interest shall be payable annually, on the first day of August of each year.

B: On default in the payment of one year's interest within the following thirty days after maturity, the obligation shall become due and the creditor shall be in position to enter suit for the collection of the amount due him.

C: All expenses, costs and damages, including the fees of lawyers and proctors, whom the creditor may appoint in order to establish judicial action for the collection of the amount due him, shall be for account of the debtor; and for the payment of these liabilities they fix in agreement the amount of $1,000.

D: The debtor shall have the right at any time of making partial payments on account of the price owed, at the rate of $250 per cab, the mortgage being partially cancelled and the cab or cabs of land which the debtor shall designate will be freed from all liability.

E: The debtor shall have the right to dispose freely of up to 60 cabs of land, which shall be considered entirely liberated and free of all liability by reason of the mortgage constituted by this document.

TENTH: That in security of the payment of the $36,500 owed, of the stipulated interest and the amount of $1,000 for expenses and costs, he constitutes a voluntary first mortgage in favor of Mr. William Barnabus Fair, on the immovable which he acquires by this instrument, and which is described in clause second.—

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

THIRTEENTH: The appearers, to whom I, the Notary, verbally made the warnings required by law, of which they stated they were informed, make express reservation of the legal mortgage in favor of the State, the Province and the Municipality; and designate the City of Cardenas and its Courts, to which jurisdiction they expressly submit themselves, as the place where all judicial and extrajudicial steps which may arise from this contract shall take place, waiving the jurisdiction of their domiciles.—

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

The William B. Fair estate paid to the Cuban Government a transfer tax, similar to an inheritance tax in the United States, on certain property situated in Cuba, including the three "mortgages."

Under Cuban law such mortgage interests in Cuban land constitute "immovable" property.

The law governing Cuba is the civil law and is derived from the Napoleonic Code. Cuban law classifies property into "movables" and "immovables." Its civil code defines "immovables" (bienes inmuebles) as follows:

ART. 334.—An immovable consists of:

1. Lands, buildings, roads, and constructions of all kinds adherent to the soil.—

\* \* \* \* \* \* \*

10.—Administrative concessions for public works, and easements, and other property rights in real estate.—

"Immovables" include leaseholds for terms of years.

Personal property is thus defined:

ART. 335.—Personal property is considered anything susceptible of appropriation and not included in the foregoing chapter, and, in general, all that which can be carried from one place to another without damage to the real estate to which it may be attached.—

ART. 336.—Incomes or pensions, either for life or hereditary, in favor of a person or family, provided they do not encumber real estate with a property lien, as well as alienated offices, contracts for public services, and mortgage loan bonds or certificates are also personal property.

The same code, article 1876 and article 105 of the Mortgage Law, refers to mortgages as follows:

A mortgage directly and immediately subjects the property on which it is imposed, whoever its possessor may be, to the fulfillment of the obligation for the security of which it was created.

Cuban law regards land and real rights in land as immovables. Mortgages are real rights under that law. The holder of a real right must satisfy the obligation by a sale of the land itself first, while the owner of a personal right can enforce payment from any property of the individual debtor. Since April 3, 1933, holders of mortgages have no right to a deficiency judgment against the obligor in the event that the amount derived from the sale of the land is less than the mortgage debt. Prior to that time a proceeding against the mortgage debtor for the deficiency was permitted. No bonds or certificates were issued to William B. Fair. Mortgages in Cuba are registered in the "Registry" of the "District" in which the land is located and can not be removed therefrom.

The correct deficiency in the estate tax is stipulated to be $4,197.09 if the mortgages are excluded from the taxable estate.

The tax here is proposed by section 302 (a) of the Revenue Act of 1926, which reads:

The value of the gross estate of the decedent shall be determined by including the value at the time of his death of all property, real or personal, tangible or intangible, wherever situated—

(a) To the extent of the interest therein of the decedent at the time of his death.

The Attorney General of the United States [1] and the Treasury Department [2] have ruled that this provision in earlier acts exempted from the base of the tax, real property of the deceased situated outside the United States. Congress amended the section in 1934 by specifically excepting from the base for the tax computation "real property [of the decedent] situated outside the United States."

Despite the clarity of the broad base for the tax computation (see *Guaranty Trust Co.* v. *Commissioner*, 79 Fed. (2d) 245, affirming Board of Tax Appeals memorandum of decision) and our consequent hesitation to constructively limit such basis (*Helvering* v. *City Bank Farmers Trust Co.*, 296 U. S. 85), we assume, for present purposes only, that the quoted provision of the Revenue Act of 1934 correctly states the intent of Congress in section 302 (a) of the Revenue Act of 1926, *supra*, which is controlling here. Cf. *Helvering* v. *Newport Co.*, 291 U. S. 485.

Does that section, so construed, include, or rather, does the implied limitation exclude or exempt the present "hipotecas" or "mortgages" from the base for the tax computation? If included, did Congress exceed its power in so doing?

As this Board said in *Retailers Credit Association of Alameda County*, 33 B. T. A. 1166:

\* \* \* To secure such exemption, the taxpayer must not only carry whatever burden of proof the determination of the pending deficiency imposes (*Helvering* v. *Taylor*, 293 U. S. 507), but must proceed perceptibly further and bring itself strictly within the provisions of the act creating the exemption. *Central Cooperative Oil Association*, 32 B. T. A. 359, and cases therein cited.

---

[1] 31 Op. Atty. Gen. 287—

ESTATE TAX ON REAL ESTATE OUTSIDE UNITED STATES.

Real estate *as such* located outside of the United States belonging to decedent resident within the United States, should not be included in determining the value of the gross estate of such decedent for the purposes of the tax imposed by Title II of the revenue act of September 8, 1916 (39 Stat. 777).

\* \* \* \* \* \*

The plain sense of the matter is that real estate in a foreign country, unlike personal estate there, can not be enjoyed *as such* in any true sense without the protection and supervision of the laws of the foreign jurisdiction in which it is situated, while as to personal property the fact may very well, for obvious reasons, be different. Hence all Governments agree to recognize the domicile of the decedent as the *situs* of primary administration upon his personal estate, while none recognizes this domicile as to his realty.

[2] T. D. 3725, 20 Treasury Decisions 435—

The following ruling is based upon an opinion of the Attorney General, dated May 14, 1918:

The value of real estate, belonging to a decedent resident within the United States at the time of his death, located outside of the United States, meaning thereby the States, Territories of Alaska and Hawaii, and the District of Columbia, should not be included in determining the value of the gross estate of such decedent for the purposes of the tax imposed by Title II of the revenue act of September 8, 1916.

Aside, however, from that measure of proof, we think the decedent's "hipotecas" were a part of his gross estate under section 302 (a), *supra*.

Under the law of this country, the term "real property" has a definite and distinct meaning, which includes lands with permanent fixtures thereon, and excludes mortgages.

But, petitioner argues that because of the conflict of laws between Cuba and the United States, in the legal characterization of these "mortgages", the Cuban classification should control, because their situs is Cuba. Assuming the correctness of the last premise, the argument would have merit if we were determining the title to property. *DeVaughn* v. *Hutchison*, 165 U. S. 566. However, here, we have no such question before us, but are deciding, only, the intended legislative base for the computation of a Federal excise tax, the power to levy which is limited by its constitutional authority, alone. Notwithstanding possible logic to the contrary, it is, at least, doubtful on practical grounds that the sovereign may be so hampered in the exercise of such an essential and inherent attribute of its sovereignty. See *Tyler* v. *United States*, 281 U. S. 497; *Lang* v. *Commissioner*, 289 U. S. 109; *Rosenberger* v. *McCaughn*, 25 Fed. (2d) 699; *Fidelity-Philadelphia Trust Co.* v. *McCaughn*, 34 Fed. (2d) 600; *Stratton* v. *United States*, 50 Fed. (2d) 48; certiorari denied, 284 U. S. 651.

But, is Cuba the situs of these "hipotecas" or mortgages? This would seem to depend upon whether they are enforceable, only, against the mortgaged properties. This Board does not take judicial notice of the laws of Cuba, and considers them here only as established as facts in the record. The testimony of petitioner's legal expert indicates that, prior to April 3, 1933, which date is subsequent to that of the death of petitioner's decedent, a mortgage creditor could proceed against the mortgage debtor, individually, for a deficiency resulting from a sale of the mortgaged property for less than the debt.

Petitioner's argument then is that since, under the laws of the Republic of Cuba, these "hipotecas" or "mortgages" were classified as "immovable property" and that general term in those laws also included "real property" in the sense in which that term is used in the laws of this country, that Congress must be held to have intended by its use of the term "real property" to include all "immovables" as that expression is used in Cuban law and other countries governed by the civil law, even though "immovables", as there used, include items of property, such as these "hipotecas" and certain leaseholds, which would not be classified in the United States as real property. We find no reasonable ground for that assumption.

These "hipotecas" in controversy were debts due the decedent, constituting the unpaid purchase price of Cuban lands. The debtors in each instance acknowledge themselves to be such, and the "hipo-

tecas" consisted of the debtors' promises to pay sums of money in gold coin of the United States, on specified dates, with interest.

It is well settled in this country that a debt has a situs for taxation at the domicile of the creditor, irrespective of the fact that it is secured by a mortgage on real estate outside the jurisdiction of the taxing authority. *Kirtland* v. *Hotchkiss*, 100 U. S. 491. Nor is that conclusion disturbed by the fact that the evidence of indebtedness is located outside the taxing jurisdiction (*People* v. *Forman*, 153 N. E. 376), or that the disposition of the mortgaged property is controlled by the laws of a foreign state. *Blodgett* v. *Silberman*, 277 U. S. 1. Cf. *Baldwin* v. *Missouri*, 281 U. S. 586; *Beidler* v. *South Carolina Tax Commission*, 282 U. S. 1; *State Tax on Foreign-Held Bonds*, 15 Wall. 300.

In construing statutes, of course, the legislative intent is the controlling factor. *United States* v. *Stone & Downer Co.*, 274 U. S. 225; *Wolsey* v. *Chapman*, 101 U. S. 755. This intent must, if possible, be ascertained from the words Congress chose to employ, interpreted according to their ordinary meaning, and in the light of all the circumstances that may fairly be regarded as having been within the knowledge of Congress at the time. *Dewey* v. *United States*, 178 U. S. 510.

The controlling statute is American, not Cuban. Thus, whether "real estate" was used there generally or technically, it would seem the meaning intended was that conveyed by the term in the United States. See Report of Finance Committee, covering amendment to section 302 (a) of the Revenue Act of 1926, adopted as section 404 of the Revenue Act of 1934.[3] Nothing in this record indicates that Congress used the term "real property" as synonymous with the Cuban word "immovables." In our opinion, it is a much more reasonable presumption that Congress, in its use of the term "real property situated outside the United States" and in providing for the inclusion in the gross estate as the broad base, for the computation of the tax on other property passing from the decedent, did so in the light of the above rule in the United States as to the situs for taxation of debts, rather than with the law of the Republic of Cuba as to "immovables" in mind. Any other conclusion would attribute to Congress a wholly unnatural, unwarranted, and improb-

[3] Your committee is of the opinion that real property located abroad should not be subject to the Federal estate tax since it is an almost universally established principle of estate taxation that real estate should be subject to death duties only in the country where situated. To tax such real estate, will make it difficult for many American citizens to live in foreign countries in the interest of American foreign trade, for they will be subject to a tax burden much greater than that imposed on foreigners in a similar situation. Accordingly, your committee has amended the House bill to make it clear that real estate located abroad shall not be subject to the Federal estate tax. The effect of this amendment with other amendments made by the House is to place nonresident American citizens in the same category as residents and thus subject them to the estate tax with respect to all of their property except real property located abroad. [S. Rept. No. 558, 73d Cong., 2d sess., p. 46.]

able legislative intent, entirely inconsistent with the evident broad inclusive basis for the tax computation, without any consideration or justification therefor, and unnecessary in accomplishing the purpose of the controlling implied exemption.[4] See *Charles W. Bowring*, 27 B. T. A. 449.

The power of Congress to impose this excise tax is as clear as its intent to exercise the power. The decedent was a citizen and resident of the United States. His will was executed under the laws of this country and he disposed of his property to citizens of this country. The property here in controversy was owned by him and transmitted by his will. The power of the Federal Government to tax its citizens is not dependent upon jurisdiction over their property. Thus, in *United States* v. *Bennett*, 232 U. S. 299, a Federal excise tax imposed upon a citizen of the United States for use of a yacht, built and with permanent situs outside of the territorial limits of this country, was sustained. There it was argued that the power to tax was limited by the capacity of the Government to afford protection to the property. In answering this argument the Court said:

* * * But here again the confusion of thought consists in mistaking the scope and extent of the sovereign power of the United States as a nation and its relation to its citizens and their relations to it. It presumes that government does not by its very nature benefit the citizen and his property wherever found. Indeed, the argument, while holding on to citizenship, belittles and destroys its advantages and blessings by denying the possession by government of an essential power required to make citizenship completely beneficial.

Following this, the Court in *Cook* v. *Tait*, 265 U. S. 47, sustained the power of Congress to impose a tax upon income of a citizen of the United States, with permanent domicile in Mexico, from real and personal property located in that country. In *Guaranty Trust Co. of New York, Executor*, 21 B. T. A. 330, we sustained the right of the Federal Government to include tangible personal property located in foreign countries in the gross estate of a resident decedent. In *Guaranty Trust Co. of New York* v. *Commissioner*, 79 Fed. (2d) 245, the estate of a resident citizen of the United States consisting of personal property located in England and disposed of by an English will, as well as personal property located in this country and disposed of by an American will, was all held within decedent's gross estate for Federal estate tax purposes. There the court said:

The power of Congress to put the value of foreign personal property in the estate tax base seems as plain as its intent to do so. The fact that this personal property was in the possession of the English executor is immaterial for the tax is imposed upon the transfer not the property. *Reinecke* v. *Northern Trust Co.*, 278 U. S. 339. The constitutional limitations upon the power of the states to tax personal property do not apply to the United States. *Burnet* v. *Brooks*, 288 U. S. 378; *United States* v. *Bennett*, 232 U. S. 299. The United

---

[4] See footnote No. 3, page 47.

States is equally free to tax the transfer of such property. In *Cook* v. *Tait*, 265 U. S. 47, the power of Congress to tax a United States citizen, domiciled outside of this country, upon income from real and personal property located in Mexico was upheld. Here the decedent received the governmental protection upon which the power to tax may be supported under the foregoing authorities until the moment he died. Of course his death was the event which took place to call the taxing statute into operation and at that time he no longer needed or could be accorded protection but the distinction the petitioner would put upon this ground is wholly unreal. The tax may well be supported by the benefit derived up to the instant of death.

We conclude the Federal Government had the power to and, in the Revenue Act of 1926, section 302 (a), did levy an estate tax computed upon the value of decedent's property, including the present mortgages or "hipotecas." Nor does the fact that double taxation may result affect that conclusion. *Burnet* v. *Chicago Portrait Co.*, 285 U. S. 1.

Reviewed by the Board.

*Decision will be entered for the respondent.*

---

VAN FOSSAN dissenting: Finding myself in disagreement with the holding of the majority, I feel impelled to state the basis of my conclusion at some length.

The tax in the case before us is claimed under section 302 (a) of the Revenue Act of 1926, which reads:

The value of the gross estate of the decedent shall be determined by including the value at the time of his death of all property, real or personal, tangible or intangible, wherever situated—

(a) To the extent of the interest therein of the decedent at the time of his death * * *.

Despite the all-inclusive language of the statute, in 31 Op. Atty. Gen. 287, the Attorney General of the United States so interpreted this section as to exclude real estate located outside the United States.

The construction given to the statute by the Attorney General was followed by the Treasury Department and has been approved by Congress in subsequent legislation (Senate Rept. No. 275, 67th Cong., 1st sess., p. 24; Senate Rept. No. 558, 73d Cong., 2d sess., p. 46) and Congress itself has formally recognized the correctness of this view by amending section 302 through the enactment of section 404 of the Revenue Act of 1934.[1]

---

[1] SEC. 404. REAL ESTATE SITUATED OUTSIDE THE UNITED STATES.

So much of section 302 of the Revenue Act of 1926 as reads as follows: "The value of the gross estate of the decedent shall be determined by including the value at the time of his death of all property, real or personal, tangible or intangible, wherever situated" is amended to read as follows: "The value of the gross estate of the decedent shall be determined by including the value at the time of his death of all property, real or personal, tangible or intangible, wherever situated, except real property situated outside the United States."

Therefore, the question to be decided is whether or not the mortgages or "hipotecas" owned by the deceased at his death constituted real property.

This problem involves not only a conflict of laws, but an utter disparity in nomenclature. The word "immovable" is not an exact equivalent of the term "real property", but the terms have substantially the same meaning.

It is a well settled rule that the nature of property or of rights thereto and the conditions governing its transfer must be determined by the *lex situs*. Story on Conflict of Laws, ¶¶424, 591; Restatement of Conflict of Laws (American Law Institute), p. 247, 12 C. J. 468, 477; *United States* v. *Fox*, 94 U. S. 315; *Robertson* v. *Pickerell*, 109 U. S. 608. Dicey, in his work, "Conflict of Laws", thus states the principle:

Rule 149. The law of the country where a thing is situate (lex situs) determines whether (1) the thing itself or (2) any right, obligation or document connected with the thing, is to be considered an immovable or a movable. [4th ed., p. 550.]

Rule 150 (p. 553) states:

All rights over, or in relation to, an immovable (land) are (subject to the exceptions hereinafter mentioned) governed by the law of the country where the immovable is situate (lex situs).

On page 558 Dicey also states:

Every question with regard to the devolution of immovables, or land, in consequence of death is, subject, of course, to the exceptions hereinafter mentioned, governed by the *lex situs*.

The exceptions are not pertinent to the question here at issue.

On examination, one of the mortgages in question is found to be primarily a deed conveying the land described for $37,500, of which $1,000 was paid in cash and the remainder according to specified terms. No notes or other evidences of indebtedness were executed to Fair. The payment of the $36,500 was secured by a first mortgage on the land sold. Cuban law permits no deficiency judgment to be taken against the purchaser, but the land itself must stand good for all unpaid purchase money. The document before us, therefore, was merely an evidence of the mortgagee's right to take the land in default of the full payment of its purchase price.

All the incidents of ownership and the factors which rendered the mortgage valuable were located in Cuba and were derived from the land in that Republic and from the power of its courts.

Mortgages are known and classified as immovables in Cuba and all the characteristics of real estate and real property designated as such in the United States, are inherent in them under Cuban law.

Therefore, although mortgages on property located in the United States might be considered personal property, a mortgage on property in Cuba would seem to fall within the term "foreign real estate." This being true, it is not subject to the estate tax imposed by the United States Government.

The respondent relies on the following propositions:

(1) The power of the Federal Government to tax is not dependent upon jurisdiction over property alone, but may be predicated upon jurisdiction over the citizen.

(2) The power to tax being an essential attribute of sovereignty is not controlled or limited by consideration of the laws of foreign countries.

(3) The statute should not be construed to exempt from its provisions debts due a citizen of the United States from the sale of foreign lands.

To support his first contention the respondent cites (and the majority opinion relies on) *United States* v. *Bennett*, 232 U. S. 299, and *Cook* v. *Tait*, 265 U. S. 47, neither of which cases involves an estate tax. The facts in these cases, moreover, were quite different from those in the case at bar. In the *Bennett* case the Government imposed an annual excise tax on the use of a foreign-built yacht owned by a citizen of the United States. In sustaining the tax the Supreme Court stressed the assistance and protection accorded by the Government to its citizens while living and trading in foreign countries. In the case of *Cook* v. *Tait* the Commissioner assessed a tax on the income of a citizen of the United States residing and domiciled in the city of Mexico. The Court there said:

* * * the basis of the power to tax was not and cannot be made dependent upon the situs of the property in all cases, it being in or out of the United States, nor was not and cannot be made dependent upon the domicil of the citizen, that being in or out of the United States, but upon his relation as citizen to the United States and the relation of the latter to him as citizen. The consequence of the relations is that the native citizen who is taxed may have domicil, and the property from which his income is derived may have situs, in a foreign country, and the tax be legal,—the government having power to impose the tax.

Thus, in this case also the decision was predicated on the benefits of citizenship, including the right to protection in a foreign country. These cases are not comparable to the case before us. There was no question of tax upon the transfer of property at death, but in the one case a tax upon personal property owned and used by an American citizen and in the other a tax on income derived from real and personal property, such property in both cases being located outside the United States. In the case at bar the element of governmental protection is not, and can not be, present. In order to enforce her rights as executrix of the will of William B. Fair, which was executed in the Spanish language and legally filed in Cuba, the petitioner

would be compelled to submit herself wholly to the jurisdiction of that country and to the requirements of its courts. Neither her citizenship nor the citizenship of her husband could help her.

The respondent also cites, and the majority relies on, *Guaranty Trust Co. of New York, Executor* (Smallman estate), 21 B. T. A. 330, and *Guaranty Trust Co. of New York* (executor of Kennedy estate) v. *Commissioner*, 79 Fed. (2d) 245. Both of these cases involve tangible personal property located outside the United States. In both it was held that an estate tax was properly assessed. The decisions were based on the citizenship of the decedent and the power to transfer. It is obvious that these decisions are not in point.

In support of the respondent's second proposition he cites several cases, all of which, however, relate to interstate taxation and do not apply to the taxation of property situated in a foreign country. In *United States* v. *Bennett, supra,* the Supreme Court made clear the distinction between the taxing by one state of property situated in another and the taxing by the United States of property situated in a foreign country. See *Burnet* v. *Brooks*, 288 U. S. 378.

The respondent relies on *Kirtland* v. *Hotchkiss*, 100 U. S. 491, to sustain his third point. In that case the holder of a bond secured by real estate in another state was held subject to tax. The decision there, likewise, was based on the theory of protection. Other cases cited by him involved tax controversies between states. He also contends that the expression "real property" means real estate as such, "that is, lands and things permanently affixed thereto" and quotes from the chairman of the Committee on Finance of the Senate (S. Rept. No. 558, 73d Cong., 2d sess., p. 46) as follows:

> Your committee is of the opinion that real property located abroad should not be subject to the Federal estate tax since it is an almost universally established principle of estate taxation that real estate should be subject to death duties only in the country where situated. To tax such real estate, will make it difficult for many American citizens to live in foreign countries in the interest of American foreign trade for they will be subject to a tax burden much greater than that imposed on foreigners in a similar situation. Accordingly, your committee has amended the House bill to make it clear that real estate located abroad shall not be subject to the Federal estate tax. The effect of this amendment with other amendments made by the House is to place nonresident American citizens in the same category as residents and thus subject them to the estate tax with respect to all of their property except real property located abroad.

The respondent can obtain little help from this quotation. In effect, the mortgages in question constituted "real property located abroad." They were so treated by Cuba. Their taxation by Cuba patently subjected the petitioner to "a tax burden much greater than that imposed on foreigners in a similar situation."

It is pertinent to note that in clause 13 of the mortgage, the parties waived the jurisdiction of their domiciles and submitted themselves to Cuban law in all respects. Their action in so doing removes all doubt, if any there was, as to the decedent's conception of the character of the mortgages as immovables.

For the reasons indicated above I dissent.